828 F.2d 211
 1987-2 Trade Cases 67,688, RICO Bus.Disp.Guide 6731
 POCAHONTAS SUPREME COAL COMPANY INC.; Edward Borg,
Plaintiffs-Appellants,
v.
BETHLEHEM STEEL CORPORATION, Jones & Laughlin Steel, Inc.;
Island Creek Coal Company; Republic Steel Corporation;
National Mines Corporation; National Steel Corporation;
Beatrice Pocahontas Company; Beckley Coal Mining Company;
Bethlehem Mines Corporation; Beth-Elkhorn Corporation;
Bishop Coal Company; Consolidation Coal Company; Gateway
Coal Company; Harmar Coal Company; Itmann Coal Company;
Kanawha Coal Company; Mathies Coal Company; National Coal
Mining Company; Olga Coal Company; Peter White Coal Mining
Corp.; Remanco, Inc.; VP-5 Mining Company; John Doe;
Richard Roe; Inland Steel Corp., Defendants-Appellees,
and
Wheeling Pittsburgh Steel Corp.; Marty Corp.; Omar Mining
Company, Defendants. (Two Cases)
POCAHONTAS SUPREME COAL COMPANY INC.; Edward Borg,
Plaintiffs-Appellees,
v.
BETHLEHEM STEEL CORPORATION, Island Creek Coal Company;
Beatrice Pocahontas Company; Bethlehem Mine Corporation;
Beth-Elkhorn Corporation; Bishop Coal Company;
Consolidation Coal Company; Gateway Coal Company; Harmar
Coal Company; Itmann Coal Company; Remanco, Inc.; VP-5
Mining Company; Inland Steel Corp., Defendants-Appellants,
and
Jones & Laughlin Steel, Inc.; Republic Steel Corporation;
National Mines Corporation; National Steel Corporation;
Beckley Coal Mining Company; Kanawha Coal Company; Mathies
Coal Company; National Coal Mining Company; Olga Coal
Company; Peter White Coal Mining Corp.; John Doe; Richard
Roe; Wheeling Pittsburgh Steel Corp.; Marty Corp.; Omar
Mining Company, Defendants.
POCAHONTAS SUPREME COAL COMPANY INC.; Edward Borg,
Plaintiffs-Appellees,
v.
NATIONAL MINES CORPORATION; National Steel Corporation;
Mathies Coal Company; National Coal Mining
Company; Peter White Coal Mining Corp.;
Defendants-Appellants,
and
Bethlehem Steel Corporation, Jones & Laughlin Steel, Inc.;
Island Creek Coal Company; Republic Steel Corporation;
Beatrice Pocahontas Company; Beckley Coal Mining Company;
Bethlehem Mines Corporation; Beth-Elkhorn Corporation;
Bishop Coal Company; Consolidation Coal Company; Gateway
Coal Company; Harmar Coal Company; Itmann Coal Company;
Kanawha Coal Company; Olga Coal Company; Remanco, Inc.;
VP-5 Mining Company; John Doe; Richard Roe; Inland Steel
Corp., Wheeling Pittsburgh Steel Corp.; Marty Corp.; Omar
Mining Company, Defendants.
 Nos. 86-3571, 86-3601, 86-3604, 86-3614.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 6, 1987.
Decided Sept. 1, 1987.
Rehearing Denied Oct. 22, 1987.
 
 Andrew Apostile Raptis, Charleston, W.Va., Robert Becht, William M. Wycoff (Thorpe, Reed & Armstrong, Pittsburgh, Pa., on brief), for Pocahontas Supreme Coal Co., Inc. and Edward Borg.
 Kathleen Merry Mills, Curtis H. Barnette, Bethlehem, Pa., on brief, for Bethlehem Steel Corp.
 James Michael Brown, File, Payne, Scherer & Brown, Beckley, W. Va., (William Leonard Neary, on brief, for Jones & Laughlin Steel, Inc. and Republic Steel Corp.
 W. Warren Upton (Winfield Turley Shaffer, Thomas J. Hurney, Jr., Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., on brief), for Island Creek Coal Co.
 E. Glenn Robinson (Robinson & McElwee, Charleston, W.Va., on brief), for Nat. Mines Corp.
 Robert F. Ruyak, Kevin P. O'Rourke, Howry & Simon, Washington, D.C., on brief, for Beckley Coal Mining Co., Kanawha Coal Co., and Olga Coal Co.
 Before RUSSELL and PHILLIPS, Circuit Judges, James R. SPENCER, United States District Judge, sitting by designation.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Pocahontas Supreme Coal Co. and its sole stockholder, Edward Borg (collectively "Pocahontas"), sued the defendants, various coal mining companies, alleging a number of federal and state antitrust violations and a civil RICO violation. The district court dismissed some of the claims as time barred, and the others for failure to state claims under Fed.R.Civ.P. 12(b)(6). The court also declined to award attorney's fees to defendants as sanctions under Fed.R.Civ.P. 11. Both parties have appealed and we affirm on both appeals.
 
 
 2
 * At the time in issue Pocahontas was a contract mining company that operated mines in McDowell and Wyoming Counties, West Virginia, until 1979. Appellant Edward Borg purchased the stock of Pocahontas in 1977. Appellees were companies engaged in the mining, purchasing, and selling of metallurgical coal in southern West Virginia.
 
 
 3
 From 1977 to 1979, Pocahontas entered into a series of at will contract mining agreements with appellee National Mines Corporation, a subsidiary of appellee National Steel Corporation. Pursuant to these agreements, Pocahontas mined coal on a particular tract of land, and National Mines paid Pocahontas a fixed price per clean ton delivered. National Mines then sold the coal to National Steel. On May 1, 1979, National Mines unilaterally terminated its agreements with Pocahontas.
 
 
 4
 Around February 1, 1980, Pocahontas sold its assets to another contract miner, Coal America, Inc. In consideration for this transfer of assets, Coal America agreed to pay Pocahontas a royalty per ton on all coal mined from the property. In January 1982, National Mines cancelled mining agreements with Coal America, agreements that served as a basis for the royalty payments from Coal America to Pocahontas.
 
 
 5
 Pocahontas then brought this action on December 19, 1984, against National Mines, National Steel and a number of other companies involved either directly or indirectly through affiliates in the mining and production of metallurgical coal in West Virginia.[1] The complaint charged as the principal basis of its several claims that the defendant companies had illegally exploited a web of subsidiary, affiliate, and contractual relationships to control the production and pricing of coal to Pocahontas's injury. Specifically, the complaint alleged that the various parent companies among defendants "deputized" persons to sit on the boards of competing subsidiaries and thereby created an interlocking directorate violative of Sec. 8 of the Clayton Act, 15 U.S.C. Sec. 19. The complaint further charged that through these interlocking directorates the defendants conspired to control the pricing and delivery of coal, thereby restraining trade in violation of the Sherman Act, 15 U.S.C. Secs. 1 et seq., as well as West Virginia Antitrust Law, W.Va.Code Secs. 47-18-1 et seq. Finally the complaint charged this general pattern of conduct as a civil claim under RICO, 18 U.S.C. Secs. 1961 et seq.
 
 
 6
 In more detail, Pocahontas asserted that National Mines's termination of the mining agreements with Pocahontas and Coal America was part of a general conspiracy among defendants to eliminate certain contract miners, including Pocahontas, and thereby to monopolize the trade in metallurgical coal in the relevant market area. Seeking to forestall time-bar defenses, Pocahontas asserted that it did not discover the existence of the alleged conspiracy until early 1984. Although they had inquired of National Mines from time to time about the low prices being paid for coal, National Mines's invariable response was market conditions. Only after searching through public records, including land title documents and mining applications at the West Virginia and Kentucky state mine agencies, and examining the many defendants' annual reports, had Pocahontas learned of the inter-relationships that alerted them to the bases for the claims made in their action.
 
 
 7
 The gist of Pocahontas's Clayton Act claim was that the various interrelationships that they eventually discovered between defendants made it possible for the parent corporations in the group to designate persons to sit on the boards of various competing subsidiaries of the parents. Because each such "planted" director acts as the agent or "deputy" of the designating parent, the effect is to create a type of interlocking directorate that violates Sec. 8 of the Clayton Act.
 
 
 8
 After a period of discovery, defendants moved to dismiss the action on a variety of grounds, and the district court dismissed on the grounds urged. Following entry of the judgment of dismissal, defendants moved for sanctions under Fed.R.Civ.P. 11, which the court denied.
 
 
 9
 This appeal by Pocahontas and cross-appeal by the defendants followed.
 
 II
 
 10
 The district court properly dismissed Pocahontas's "interlocking directorates" claim under Sec. 8 of the Clayton Act.
 
 
 11
 Defendants' motion to dismiss this claim was made under Fed.R.Civ.P. 12(b)(6). But we think the district court in its eventual ruling properly acted upon it, though without formally so stating, as a motion for summary judgment under Fed.R.Civ.P. 12(b) which authorizes such a disposition when "matters outside the pleading are presented to and not excluded by the court." Here, following the filing of the 12(b)(6) motion, the defendants submitted, by direction of the court, memoranda of law particularizing their assertion that Pocahontas's Sec. 8 claim was not provable as alleged. Specifically they questioned whether Pocahontas's conclusory allegations, which essentially simply tracked the statutory language of Sec. 8, could be supported by the necessary hard evidence on certain key elements of the claim. Before ruling on the motion, as supported by these particularized assertions of deficiency, the district court allowed a period of discovery specifically devoted to the matters raised in the motion to dismiss. Pocahontas availed itself of this opportunity by serving and receiving responses to interrogatories which inquired extensively into the details of defendants' production, pricing, purchases, sales, capital structures, business names, business affiliation and subsidiaries, commercial relationships, and internal governance procedures. When the district court ruled on the motion, it had before it all of the pleadings, motion papers, and discovery materials related to this claim.
 
 
 12
 The Supreme Court has recently held that without any supporting affidavits or other materials negating the adversary's claim, a movant for summary judgment may cast upon a non-moving party who will have the burden of proof at trial the burden of producing a forecast of evidence sufficient to establish his prima facie case; that the movant's summary judgment burden is simply that of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings [etc.],' which it believes demonstrate the absence of genuine issue of material fact"; and that upon the non-moving party's failure, "after adequate time for discovery," to carry the burden so imposed, summary judgment against him may be granted. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 
 13
 Here, we are satisfied, the requisites for a grant of summary judgment against Pocahontas under Fed.R.Civ.P. 12(b) and 56, as interpreted by Celotex, were present. The defendants' particularized motion informing the court and Pocahontas of the respects in which it believed the claims as pleaded incapable of proof served the function of a summary judgment motion. It sufficiently alerted Pocahontas to the necessity to demonstrate the availability of evidence sufficiently supporting its claim to create genuine issues of material fact. See Celotex, 106 S.Ct. at 2553. The district court's order allowing discovery devoted to the matters thus put in issue gave Pocahontas an adequate opportunity to develop the evidence, an opportunity acted upon by Pocahontas in obvious awareness of the necessity presented. See id. The case was therefore ripe for adjudication as by summary judgment when the district court ruled on the basis of the pleadings, motion papers, and discovery materials then making up the record.
 
 
 14
 Treating the ruling, therefore, as one granting summary judgment, we are satisfied that the court correctly determined that, on the record before it, Pocahontas had not carried its burden and that defendants were therefore entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); see also George v. Kay, 632 F.2d 1103, 1106 (4th Cir.1980) (dismissal under Rule 12(b)(6) may be reviewed and affirmed as proper grant of summary judgment under Rules 12(b) and 56(c)).
 
 
 15
 The essential elements of a Sec. 8 Clayton Act claim are that (1) one person serves as a director of two or more corporations; (2) the combined capital, surplus and undivided profits of any one of the corporations exceeds $1 million; (3) each corporation is engaged in whole or in part in interstate commerce; and (4) the corporations compete with one another. Bankamerica Corp. v. United States, 462 U.S. 122, 124, 103 S.Ct. 2266, 2268, 76 L.Ed.2d 456 (1983); American Bakeries Co. v. Gourmet Bakers, Inc., 515 F.Supp. 977, 979 (D.Md.1981). The competitor "interlocks" prohibited by Sec. 8 are only horizontal, not vertical, ones. See Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1205 (2d Cir.1978).
 
 
 16
 Pocahontas's final, amended complaint alleged the essential statutory elements of this claim in conclusory form without identifying any specific persons who sat on the boards of particular competing and otherwise covered corporations. Though some individuals were identified as directors of some defendant corporations, there were no factual averments as opposed to conclusory assertions identifying the corporations as competitors within statutory contemplation. In other portions of the complaint, specific individuals were identified as "officers and/or directors" of corporations that were conclusorily alleged to be statutory competitors. Finally, in one paragraph of the complaint, Pocahontas sought to invoke, again in conclusory terms, the so-called "deputization" theory of "interlocking directorates." Under this theory when a parent company designates different persons to sit on the boards of competing subsidiaries, these persons are treated as "deputies" of the same principal so that they are the same person for Sec. 8 interlock purposes. Again, the complaint did not purport to identify the directors or boards involved in such a "deputization" scheme.
 
 
 17
 When the district court ruled on the pending motion to dismiss, Pocahontas, fully apprised of the asserted deficiencies in its claim as pleaded, had had ample opportunity to discover the evidence needed to support it. The dismissal order cannot therefore be thought to have "railroaded" Pocahontas by coming too early and without adequate opportunity to respond to the pending motion. See Celotex, 106 S.Ct. at 2554.
 
 
 18
 In this setting, Pocahontas had failed, however, to come up with the necessary forecast of hard evidence to avoid summary dismissal. See id. (noting that "district courts ... possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence"). Specifically, no evidence was proffered that particular persons sat on the boards of corporations shown, rather than merely alleged in conclusory terms, to be competitors in the required statutory sense. The ambiguous allegation that certain persons were "officers and/or directors" of competing companies remained ambiguous on the critical point. The sharing of officers, or of persons who are officers of one corporation and directors of a competing corporation does not violate Sec. 8. See 15 U.S.C. Sec. 19; 5 E. Kintner, Federal Antitrust Law Sec. 42.7 (1984).
 
 
 19
 Finally, even if the "deputization" theory be accepted, a matter we need not decide here,[2] it was not supportable on the record before the district court. There remained on the record only conclusory allegations that deputization had occurred; no "deputies" were identified, though evidence, either direct or circumstantial, of their existence was surely discoverable within the time provided if they did in fact exist or if their existence was at least arguable.
 
 
 20
 We think that the district court rightly adjudged that despite adequate opportunity to put a forecast of hard proof of its Sec. 8 claim on the line, Pocahontas had not done so. In those circumstances a court need not withhold summary judgment, even in complicated cases such as antitrust, simply because there may remain "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The burden cast upon Pocahontas was to come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e); it could not at this point rely only on its conclusory pleading allegations to hold the case at issue. See Matsushita, 106 S.Ct. at 1356. The district court rightly perceived that on no more hard evidence than Pocahontas had put in the record no rational trier of fact, properly instructed in the substantive law and on the burden of proof, could find for Pocahontas on its Sec. 8 claim, and that summary judgment was therefore appropriate. See id.
 
 III
 
 21
 The district court dismissed Pocahontas's claims under Secs. 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. Secs. 1 and 2, as time-barred by the four-year statute of limitations applicable to all private antitrust actions, 15 U.S.C. Sec. 15b. We find no error in this.
 
 
 22
 Accrual of a private antitrust cause of action for purposes of the statute of limitations occurs when defendants commit an act that causes economic harm to a plaintiff. Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Even when defendants continue to perform overt acts in furtherance of an antitrust conspiracy within the statutory period, plaintiffs' injuries also must fall within the limitations period in order not to be time-barred. Imperial Point Colonnades Condominium v. Manqurian, 549 F.2d 1029, 1034-35 (5th Cir.1977); Garelick v. Goerlich's, Inc., 323 F.2d 854, 855-56 (6th Cir.1963); see Zenith Radio Corp., 401 U.S. at 338, 91 S.Ct. at 806.
 
 
 23
 The primary injury upon which Pocahontas's action was based was the May 1, 1979 termination of its contract mining agreement with National Mines. Pocahontas also alleged injury sustained in 1981 and 1982 when National Mines terminated the contract mining agreements with Coal America, thereby foreclosing the source of royalty payments Coal America had agreed to pay to Pocahontas and leading to the transfer by Coal America of all its mining rights to Aurora Mining Company.
 
 
 24
 This suit was filed on December 19, 1984. Any antitrust injury Pocahontas sustained by termination of the contract mining agreements on May 1, 1979 therefore falls outside the four year statute of limitations. Pocahontas sought to avoid the bar of the statute by drawing on the doctrine of fraudulent concealment to toll the statute. See Holmberg v. Armbrecht, 327 U.S. 392, 396-97, 66 S.Ct. 582, 584-85, 90 L.Ed. 743 (1946).
 
 
 25
 The district court rejected this tolling argument and we agree.
 
 
 26
 To toll the statute on this basis, a claimant must establish that (1) the party pleading the statute fraudulently concealed facts which are the basis of a claim, and that (2) the claimant failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir.1974). Pocahontas alleged that it had only discovered facts that would lead to knowledge of the alleged combination and conspiracy in February 1984, when, during meetings with the Department of Mines, its attorney was told about the interrelationships of the defendant companies and given the names of the primary participants in the alleged illegal scheme. Pocahontas asserted that two types of information were concealed from it up until that time: (1) the existence of the interrelationships among the defendant companies and (2) the defendants' specific activities undertaken pursuant to the conspiracy, such as the boycotts, suspensions, systematic terminations of contract miners, delivery quotas, and related manipulative and deceptive practices ultimately alleged.
 
 
 27
 Properly taking into account the indisputable fact that any structural interrelationship between the corporate defendants was necessarily discoverable upon simple inquiry and consultation of public records long before 1984, the district court rejected this element of Pocahontas's claim. We agree with the district court that Pocahontas could not validly claim more than ignorance, rather than fraudulent concealment of this particular information. That will not suffice. Charlotte Telecasters v. Jefferson-Pilot Corp., 546 F.2d 570, 574 (4th Cir.1976).
 
 
 28
 Pocahontas's averments that the defendants employed techniques of secrecy to avoid detection of the combination and conspiracy is no more tenable once its details as pleaded are considered. The specific claim of concealment was that during the time Pocahontas and National Mines operated under their contract mining agreements, Pocahontas inquired of National Mines why National Mines refused to accept certain deliveries of coal and why the price paid for delivered coal was so low. Instead of responding that the pricing and delivery policies were the result of concerted, illegal antitrust activity, National Mines responded that the delivery quotas were due to a railroad strike that affected National Mines' ability to store the coal and that the pricing simply was the maximum allowable. This claim borders on sophistry and falls of its own weight. To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations in these cases. It can hardly be imagined that illegal activities would ever be so gratuitously revealed. "Fraudulent concealment" implies conduct more affirmatively directed at deflecting litigation than that alleged here; and "due diligence" contemplates more than the unpursued inquiry allegedly made by Pocahontas.
 
 
 29
 Pocahontas 's vague allegations of fraudulent concealment of defendants' alleged antitrust violation in May 1979 were rightly rejected on their face.
 
 
 30
 Even under modern liberal rules of pleading "justice" still requires that a plaintiff seeking to escape the statute in such a case shall make "distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made."
 
 
 31
 Weinberger, 498 F.2d at 555 (quoting Moviecolor, Ltd. v. Eastman Kodak Co., 288 F.2d 80, 88 (2d Cir.1961) (quoting Stearns v. Page, 7 How. 819, 829, 12 L.Ed. 928 (1849))); see also Charlotte Telecasters, 546 F.2d at 574 (a plaintiff must plead distinctly the facts necessary to show the essential elements of a fraudulent concealment claim); see Fed.R.Civ.P. 9(b) (fraud must be pleaded "with particularity").
 
 
 32
 With the asserted antitrust injury incurred in 1979 thus time-barred, Pocahontas was left with National Mines's termination of mining agreements with Coal America in 1981 and 1982 to supply the requisite antitrust injury within the limitation period. Because Pocahontas was to have received royalty payments from Coal America's mining efforts pursuant to the cancelled agreements, it claims standing to assert this as antitrust injury incurred within the limitation period. The district court agreed with defendants that any injury to Pocahontas from this termination was too remote and indirect to constitute actionable antitrust injury to Pocahontas. We also agree.
 
 
 33
 "Antitrust standing" to claim treble damages for particular harms under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15, is to be assessed on a case-by-case basis, taking into account the factors identified in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). These factors, designed in combination to put principled limits on the literally unbounded reach of the threefold damage remedy authorized by Sec. 4 of the Clayton Act, see Associated Contractors, 459 U.S. at 529-35, 103 S.Ct. at 903-07, include: the risk of duplicative recovery by multiple antitrust claimants, Blue Shield, 457 U.S. at 474-75, 102 S.Ct. at 2545-46; Associated Contractors, 459 U.S. at 544-45, 103 S.Ct. at 911-12; the extent to which the claim is based upon speculative, abstract, or impractical measures of damages, Blue Shield, 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11; see also Associated Contractors, 459 U.S. 542-45, 103 S.Ct. 910-12; the causal connection between the alleged violation and the harm suffered, Blue Shield, 457 U.S. at 476-78, 102 S.Ct. at 2546-48; see also Associated Contractors, 459 U.S. at 537, 540-42, 103 S.Ct. at 908, 909-11; and the relationship of the injury alleged to the forms of injury about which Congress was concerned when it created a private remedy Blue Shield, 457 U.S. at 478, 481-84, 102 S.Ct. at 2547, 2549-51; see also Associated Contractors, 459 U.S. at 538-40, 103 S.Ct. at 908-10.
 
 
 34
 Applying these factors, we agree with the district court that any harm to Pocahontas resulting from Coal America contract terminations in 1981 and 1982 is not a cognizable antitrust injury compensable under Sec. 4. Though there is obviously a causal relation between the conduct and harm as alleged, it is remote rather than direct. The direct antitrust injury, if any, is that of Coal America. This raises a threat of duplicative treble damages recoveries which counsels restraint in allowing recovery for more indirect injuries in a chain of causation. The ascertainment of damages based on loss of necessarily speculative royalties would necessarily be difficult and equally speculative.
 
 
 35
 We also affirm the district court's ruling that Pocahontas does not have standing to seek injunctive relief for any injury resulting from the 1981 and 1982 terminations of the Coal America contracts. The "antitrust standing" requirements for claimants seeking only injunctive relief concededly are less stringent than are those for claimants seeking treble money damages, see, e.g., Parks v. Watson, 716 F.2d 646, 662 (9th Cir.1983) (need only show threatened loss that proximately results from the antitrust violation); see also 15 U.S.C. Sec. 26 (standing measured by normal requirements for equitable relief). Nevertheless, we are satisfied that just as the causal connection between harm and violation was too attenuated to support standing to seek such a treble damages remedy, it is too attenuated to permit prosecution of a claim for injunctive relief.
 
 
 36
 The specific activity Pocahontas seeks to enjoin is that related to National Mines' termination of the contract mining agreements with Coal America. The injury on which standing to seek this injunction is premised is the claimed inability of Pocahontas effectively to dispose of its assets to Coal America. We agree with the district court that the chain of causation between the claimed antitrust violation and this claimed injury to Pocahontas is too attenuated to be considered proximate, hence to support standing to invoke the private injunctive relief sought.
 
 IV
 
 37
 We also agree with the district court's ruling that Pocahontas's civil RICO claim against all defendants, see 18 U.S.C. Sec. 1961 et seq., was barred by the statute of limitations.
 
 
 38
 RICO claims are governed by the same four-year statute of limitations applicable to Clayton Act actions, Agency Holding Corp. v. Malley-Duff & Associates, --- U.S. ----, ----, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987), affirming Malley-Duff v. Crown Life Insurance Co., 792 F.2d 341 (3d Cir.1986), and the statutory period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action, see Compton v. Ide, 732 F.2d 1429, 1433 (9th Cir.1984). Pocahontas's claimed May 1979 injury lies outside the statutory period. Pocahontas's claim of fraudulent concealment is as unavailing here as it was for the Sherman Act claims, for the same reasons discussed in connection with those claims. And to the extent the 1981 and 1982 terminations are sought to be pleaded as separate civil RICO claims, we hold that they are without merit.
 
 V
 
 39
 We also affirm the district court's decision to dismiss as untimely the pendent West Virginia Antitrust Act claim, W.Va.Code Sec. 47-18-1 et seq. (1980). The statute of limitations for such claims provides that:
 
 
 40
 [a]ny action brought to enforce the provisions of this article shall be barred unless commenced within four years after the cause of action arose, or if the cause of action is based upon a conspiracy in violation of this article, within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered the facts relied upon for proof of the conspiracy. For the purpose of this section, a cause of action for a continuing violation is deemed to arise at any time during the period of such violation.
 
 
 41
 W.Va.Code Sec. 47-18-11.
 
 
 42
 For the same reasons that Pocahontas's federal antitrust suits were untimely filed, the pendent state claim was untimely under West Virginia law. Pocahontas's last direct injury as alleged occurred on May 1, 1979. By failing to take action earlier than 1984 to investigate the corporate relationship and activities on which the state claim was ultimately based, Pocahontas failed to exercise the "reasonable diligence" required to gain the benefit of the extended statutory period. See Charlotte Telecasters, 546 F.2d at 574 (plea of ignorance insufficient to raise inference of exercise of diligence). Accordingly, we affirm the district court's dismissal of the pendent state claim.
 
 VI
 
 43
 The appellees cross appeal the district court's refusal to award Rule 11 sanctions. Fed.R.Civ.P. 11 provides that
 
 
 44
 The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction....
 
 
 45
 In its Note to the 1983 Amendments to the Rule, the Advisory Committee stated:
 
 
 46
 The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.
 
 
 47
 Defendants, contending that Pocahontas and its counsel have not made the "reasonable inquiry" contemplated by the Rule, point out that Pocahontas has engaged one or more of them in other, related litigation in various state and federal courts for the past six years and that Pocahontas has been unrelenting in continuing to press these actions despite their consistent lack of success. Aside from this course of conduct which they say reveals the essentially harassing purpose of all this litigation, defendants contend that the conclusory nature of the complaint in this case itself demonstrates a lack of reasonable inquiry. And they assert that the "dragnet" approach of naming defendants presents compelling reasons for imposing sanctions. See, e.g., Kinee v. Abraham Lincoln Federal Savings and Loan Association, 365 F.Supp. 975, 982-83 (E.D.Pa.1973).
 
 
 48
 The district court considered the claim for Rule 11 sanctions extensively, obviously treating it as one of seriousness. In the end the court was unwilling to ascribe to Pocahontas and its counsel the motivation required to impose sanctions and declined in its discretion to do so. We cannot find in this an abuse of discretion.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 After commencement of the action, but before decision in the district court, defendants Wheeling-Pittsburgh and LTV Steel Company, formerly known as Republic Steel Corporation and successor to defendant Jones & Laughlin Steel, Incorporated, filed Petitions in Bankruptcy. This action was dismissed as against Wheeling-Pittsburgh on August 5, 1985 and stayed pursuant to Section 362(a) of the Bankruptcy Code as against LTV Steel. On or about April 29, 1985, defendant Consolidation Coal Company commenced an action against its affiliate, defendant Harmar Coal Company in the Court of Common Pleas of Allegheny County, Pennsylvania for the appointment of a receiver. On or about May 3, 1985 a receiver was duly appointed. This action has been stayed by consent of Pocahontas as against Harmar
 
 
 [2]
 Though the "deputization" theory has been advanced by the Justice Department in specific litigation, see United States v. Cleveland Trust, 392 F.Supp. 699 (N.D.Ohio 1974), aff'd mem., 513 F.2d 633 (6th Cir.1975), it has not been adopted by any court, see United Auto Workers, 97 F.T.C. Op. 933, 935 (1981)