Harvey K. BREWER, Plaintiff,

v.

DANA CORPORATION SPICER HEAVY AXLE DIVISION; Dana World Trade Federation; Plan Administrator, the Director, Dana Benefits and Payroll Services; and Dana–Spicer, Inc., Defendants.

No. 1:01CV12–C.

United States District Court, W.D. North Carolina, Asheville Division.

May 16, 2002.

Phyllis A. Palmieri, Morganton, NC, for plaintiff.

Kevin J. Dalton, Mason G. Alexander, Ellzey & Brooks, LLC, Charlotte, NC, for defendants.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendants' Motion for Summary Judgment. Having considered that motion and supporting brief, plaintiff's amended response, and defendants' reply, and having conducted a hearing at which oral arguments were presented, the court enters the following findings, conclusions, and decision.

## FINDINGS AND CONCLUSIONS

### I. Nature of the Case

In this matter, plaintiff contends that his termination from defendants' employ was in retaliation for his use of short-term medical disability leave. He alleges in his first cause of action that his termination amounted to a wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). In his second cause of action, plaintiff contends, in the alternative, that his termination violated 42, United States Code, Section 1981, and Sections 2000e, *et seq.*, inasmuch as defendants failed to treat race neutrally when they investigated and imposed discipline for violations of work rules, which related to engaging in outside employment while on medical leave.

### II. Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

[T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle*, 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.1979).

### III. Factual Background

Although the parties disagree as to what legal conclusions the court should draw, there exists no genuine issue of any material fact in this case. The court has divided the factual determinations into two sections—the first providing an overview and the second providing detail as to plaintiff's March 2000 medical leave.

#### A. Overview

Defendants operate a parts manufacturing plant in Morganton, North Carolina, at which they manufacture truck and tractor parts. Plaintiff worked for defendants from 1994 to 2000, and he admits that he was never denied a job or a pay raise based on his race—African-American.

Plaintiff applied for and was granted short-term medical disability leave from March 16, 2000, to April 5, 2000. His employment with defendants was terminated upon his return to work on April 6, 2000. While plaintiff was an at-will employee, defendants contend that he was terminated for cause, inasmuch as they concluded that he violated work rules by engaging in outside employment during a period of medical leave.

During his deposition, plaintiff testified that he did not believe and had no evidence that he was fired because he took medical leave, inasmuch as the taking and granting of medical leave was commonplace at the plant. Instead, plaintiff testified that he believed he was terminated based on his race.

At all relevant times, plaintiff and his family have operated "Brewer Transportation, Inc.," which contracts with public agencies in and around the Morganton area to provide transportation services for clients to and from work, places of business, health-care facilities, and educational centers. Plaintiff testified that the business grossed more than $250,000 during the year 2000.

In is undisputed that when plaintiff took medical leave in March 2000, the plant's human resources director, Grant Shepler, received a series of reports that plaintiff was seen transporting people in the community. First, a supervisor passed on to Shepler reports from other employees who had observed the violation. Second, a report from an investigator was ordered, which concluded plaintiff was violating the work rule. Third, after such report issued, other coworkers, without knowledge of the investigation, reported seeing plaintiff driving for hire in the community.

In addition to having ordered the investigation of plaintiff, Shepler had also ordered the investigation of four Caucasian employees in the previous year for similar violations. It is undisputed that Shepler employed the same investigator, Lyle Bishop, in all the cases. As to the four Caucasian employees investigated, Bishop obtained evidence that two were working while on medical disability, but no such evidence was uncovered as to the other two. One of the two discovered to have

been working while on medical disability was fired by Shepler, and the other asked to resign when told he was being terminated.

Shepler became the human resources manager in June 1997. After arriving at the Morganton plant, he issued an employee handbook containing plant policies and rules that went into effect in January 1998. Plaintiff was issued a copy of this handbook and had it in his possession when he was terminated. Two rules in the handbook prohibited employees from engaging in other employment, including self-employment, while on medical disability leave. At page 18 of the employee handbook, the rules provided that "[w]hile on leave of absence, you may not work somewhere else (including self-employment) without written approval from the plant manager." At page 28 of the employee handbook, the rules further provided, as follows:

> Your length of service is a valuable asset, but it can be lost if your employment ends. Employment is terminated for the following reasons: ... (6). You work elsewhere (including self-employment) during a leave of absence without written approval of the plant manager.

Exhibit 6 to Shepler Deposition. Plaintiff admitted during his deposition that he was aware of such rules before he took medical leave in March 2000. Brewer Deposition, at 138–39. Plaintiff also admitted that he was aware that other employees had been fired for violations of such rules and that they had been placed under surveillance. *Id.*, at 142–43.

### B. Plaintiff's Medical Leave

On March 16, 2000, plaintiff was involved in an automobile accident, suffered injuries, and applied for and received a short-term leave of absence for medical disability. In accordance with a benefit plan, which is covered by ERISA, plaintiff received benefits during that period of leave.

During the period of leave, two of plaintiff's coworkers informed Shepler that plaintiff was operating his business during medical leave. One of those employees, who was a supervisor, told Shepler of a report he had received that plaintiff was operating his transportation service while on disability leave. That supervisor's source had knowledge of the rule violation, was a driver for plaintiff's business, and had a reputation for honesty and truthfulness in the plant. Shepler Deposition, at 81–82. Such employee told Shepler that plaintiff was driving for hire through his business while on medical disability leave. Subsequently, the same supervisor again approached Shepler and told him that other employees had reported that plaintiff was operating his transportation service while on medical leave.

Based upon such reports and allegations, Shepler consulted with Chestine Boyd, the plant nurse, and they decided to investigate the allegations. As was done with Caucasian employees, defendants hired Lyle Bishop from Edwards & Associates. On the day Bishop was hired, March 28, 2000, surveillance of plaintiff began, and a 13–page report was submitted May 31, 2000, outlining what the investigators had observed. Of substance, Bishop observed plaintiff on March 30, 2000, depart from his home and pick up a female passenger at 6:50 a.m. from an apartment complex in Morganton. Brewer then drove her to the Henredon Furniture Company in Morganton.[1] After that

---

1. While not relevant to what defendants perceived at the time of plaintiff's termination, plaintiff admitted at his deposition that the

Burke County Department of Social Services retains him to transport people to the Henre-

trip was completed, Bishop observed that plaintiff took a 15–minute break and then drove out through the country to the Blue Ridge Venture Mobile Home Park, where he picked up a female passenger and drove her to the Morganton Vocational Rehabilitation Center.[2]

On March 31, 2000, Bishop prepared a report detailing the investigation. In the last paragraph of his report, Bishop stated: "It is obvious that Mr. Brewer has in fact continued his delivery service operation."

In addition to the report of the private investigator and the allegations which prompted such investigation, Shepler also received reports from other employees who had observed plaintiff during his period of medical leave. Dave Cole was an Area Manager, who reported to Shepler that while driving home on his lunch break, he witnessed plaintiff driving passengers in a van while plaintiff was on medical leave. He further reported that the van had a sign reading "Brewer Transportation, Inc." on the side of it. Cole told Shepler that two people were seated in the rear portion of the van and no one was seated in the front passenger seat.[3] Cole was unaware that private investigators had been retained to place plaintiff under surveillance or that Shepler had any suspicion that plaintiff was violating the plant rules regarding working on medical disability. Cole Deposition, at 33.

Plaintiff's supervisor, Bud Oxford, also observed plaintiff driving passengers in a van during his period of medical leave, and plaintiff admits that he saw Oxford.

don Furniture Company. Brewer Deposition, at 189.

**2.** While not relevant to what defendants perceived at the time of plaintiff's termination, plaintiff stated at his deposition that he does transport people for hire to the Vocational Rehabilitation Center in Morganton. Brewer Deposition, at 181.

Brewer Deposition, at 201–02. Plaintiff admitted that he was driving three passengers in the vehicle at the time, *id.*, at 202–203, and thereafter called Oxford and told him he would be back at work the next day. *Id.*, at 205–06. It is plaintiff's contention, however, that Oxford had a score to settle, inasmuch as his previous attempt to have plaintiff fired had failed.

Plaintiff returned to work on April 5, 2000, and was called in to meet with Shepler and Cole. While he admitted no wrongdoing during the meeting, he was suspended and told to return the next day. Shepler testified that based on the above-discussed information, he believed that plaintiff was operating his transportation service in violation of plant rules. Plaintiff testified that, as he read the report, there was no reason for his employer not to believe it, and that the report made it appear that plaintiff was providing transportation services for hire and was operating his transportation service during medical leave. Brewer Deposition, at 233.

## IV. Discussion

A common thread in plaintiff's response to defendants' Motion for Summary Judgment is that he did not actually violate the work rules and that the private investigator's surveillance should have been more extensive. Even if the court were to agree with plaintiff on those points, neither is relevant to the ERISA or Section 1981 inquiry.

**3.** While not relevant to what defendants perceived at the time of plaintiff's termination, plaintiff testified that he has never driven friends in the back seat of his van if the front seat is available. Brewer Deposition, at 167.

## A. ERISA Claim

In support of his claim that his termination was violative of the protections afforded by ERISA, plaintiff makes two salient contentions:

1. that he was "subjected to an adverse employment decision, that is, surveillance and/or threats of surveillance on account of his having asserted his right to benefits under an ERISA covered plan, for the purpose of interfering with benefits to which he had become or would become entitled." (Second Amended Complaint, at 30)

2. that his discharge was motivated by defendants' intent "to interfere with the ERISA covered benefits to which Plaintiff had become or would become entitled. Such benefits to which plaintiff had become or would become entitled were the receipt of short-term disability benefits, and the right to return to his employment with corporate defendants without interruption in his seniority, loss of wages, or diminution of any other benefit at the close of his period of short-term disability." Second Amended Complaint, at 19.[4]

Reading such pleading in a light most favorable to plaintiff, it appears that he is contending that the surveillance was an adverse employment action taken by his employer in retaliation for his having applied for and received short-term disability benefits. In addition, it would appear that plaintiff is alleging that his termination was an adverse employment action intended to terminate whatever future benefits he may have been able to receive under various ERISA plans had he remained employed by defendants.

Plaintiff's own deposition testimony is antithetical to his claim. He testified that

he had no reason to believe that anyone terminated him with the intent of depriving him of disability benefits, medical leave benefits, or future benefits under defendants' ERISA plan, or for any other motive relating to the ERISA plan/benefits. Brewer Deposition, at 145–46, 150–51. In further testifying that he did not believe he was discharged because he took medical disability leave, plaintiff stated, as follows:

In that line of work there are constant injuries. I mean for at least six years I was there, people were getting hurt all the time, so for them to—No.

Brewer Deposition, at 151.

■■■ While plaintiff's testimony is fatal to the continuance of his ERISA claim for additional benefits, it also appears that such claim was not viable from its inception. To seek recovery of additional benefits in this court, a plaintiff must first exhaust his plan's administrative remedies. There is no evidence that plaintiff ever applied for any additional ERISA benefit after his termination that was declined by the plan administrator.

An ERISA claimant generally is required to exhaust the remedies provided by the employee benefit plan in which he participates as a prerequisite to an ERISA action for denial of benefits under 29 U.S.C. § 1132.

*Makar v. Health Care Corp.*, 872 F.2d 80, 82 (4th Cir.1989).

■■■ To the extent plaintiff is contending that his termination was intended to interfere with his ability to receive benefits based on continued employment and seniority, he has presented no evidence that would support such a claim. Section 510 of the Act governs that type of claim:

It shall be unlawful for any person to discharge . . . a participant or beneficiary

---

4. Errors in original corrected.

[of an employee benefit plan]... for the purpose of interfering with their attainment of any right to which such participant may become entitled under the plan.

Section 510 protects plan participants from termination that is motivated by an employer's desire to prevent an employee from receiving benefits earned, but not paid, or rights due, but not yet fulfilled. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

The primary focus of § 510 is to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights."

*Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237 (4th Cir.1991)(quoting *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980)).

Extending § 510 to encompass claims brought by vested employees for denial of additional benefits comports with both the legislative language and the intent of Congress to give employees "broad remedies" for violations of pension rights ... Surely Congress was not limiting § 510 only to those rights which a participant acquires upon vesting.

*Id.* at 237. As to what is required in order to maintain and move forward to trial on such a claim, the *Conkwright* court held, in pertinent part, as follows:

To take advantage of § 510, one must prove a specific intent of the employer to interfere with an employee's pension rights. In seeking to prove specific intent, a claimant in the ERISA context confronts proof problems similar to those encountered by Title VII plaintiffs: employers rarely, if ever, memorialize their specific intent to act unlawfully ... We hold that the *McDonnell Douglas* scheme of presumptions and

shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA.

*Id.* at 239.

■ Defendants having articulated a legitimate reason for discharging plaintiff—violation of work rules—the onus of proof shifts back to plaintiff to prove that he was a victim of intentional discrimination. That burden can be satisfied by showing that the reason defendants have put forward is a mere pretext for discrimination and that the plaintiff's application for and future entitlement to benefits is the more likely reason for the termination. *See generally Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir.1988), *cert denied,* 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). In making such determination,

[t]he question is not whether [defendants] exercised prudent business judgment, ... but whether [plaintiff] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.

*Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986) (citations omitted), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Consistent with the Court of Appeals for the Seventh Circuit, the Fourth Circuit reasoned that what is relevant is not a plaintiff's belief that he was fired because of a discriminatory reason, but "the perception of the decisionmaker." *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980). *See Elliott v. Group Medical & Surgical Service,* 714 F.2d 556 (5th Cir.1983). Plaintiff must prove not only that defendants' reasons for his discharge are false, but that discrimination

under ERISA was the real reason for his discharge. *Vaughan v. Metrahealth Cos.*, 145 F.3d 197, 202 (4th Cir.1998).

The only relevant evidence of record is that defendants routinely grant medical leave to injured employees. There simply is no evidence of a pattern or practice where defendants terminate employees who use medical leave benefits. Plaintiff has not presented any evidence that the reason given for his termination was false and that the real reason was Section 510 discrimination. The undisputed evidence reveals that the handful of terminations by defendants (in relation to the hundreds of medical leaves taken) during the relevant time were for documented violations of the same work rule which defendants have shown they had reason to believe plaintiff violated. It is plaintiff's burden to present evidence that would support each and every element of his claim, and the court finds that he has presented no evidence of pretext. Summary judgment will be granted to defendants on such claim.

### B. Sections 1981 and 2000e Claim

#### 1. Elements of a *Prima Facie* Case

A plaintiff may prove a claim of race discrimination by direct evidence of intentional discrimination or may prove discriminatory intent through circumstantial evidence by using the indirect method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which has been adapted to Section 1981 cases. In the present case, plaintiff has offered no direct evidence of race discrimination. He, therefore, must establish his claim with circumstantial evidence using the "3–stage scheme of proof originally formulated for Title VII cases." *Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir.1988). The three-stage scheme includes the following:

(1) plaintiff making out a *prima facie* case of race discrimination;

(2) if plaintiff satisfies his burden, the burden of production shifts to defendant[s] to articulate a legitimate, nondiscriminatory reason for [their] actions; and

(3) if defendant[s] [satisfy their] burden, plaintiff must show by a preponderance of the evidence that defendant[s'] legitimate, nondiscriminatory reason was a pretext for discrimination.

*Id.* As shown below, summary judgment is appropriate because plaintiff cannot satisfy his burden of establishing a *prima facie* case and has not proffered evidence upon which a reasonable fact finder could infer that defendants' reasons for their actions were pretextual.

#### 2. *Prima Facie* Case

In the context of a termination, plaintiff must prove three elements to establish a *prima facie* case of race discrimination:

(1) he is a member of a protected class,

(2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and

(3) disciplinary measures enforced against him were more severe than those enforced against other employees

*See generally Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 239 (4th Cir. 1982).

 The first two elements have been satisfied by plaintiff, but he has presented no evidence that the discipline he received was more severe than that received by Caucasian employees. Of the four other employees Shepler investigated for similar offenses during his tenure, all were Caucasian and two were fired, just like plaintiff. While plaintiff attempts to bring in additional reasons why the remaining two were

not fired, those reasons, such as familial or future familial relation, have nothing to do with race and are not relevant. Each of the Caucasian employees had been subjected to private investigations, and those who were determined to have violated the work rule were terminated, while those who were not were retained. Plaintiff's arguments concerning the longevity of the investigations of some of the Caucasian employees is unpersuasive and antithetical to his claim, inasmuch as it shows that defendants pursued evidence against Caucasians longer. Just because the investigator was able to find evidence of a violation of the work rule quicker in plaintiff's case does not lead to any inference of racial animus.

Plaintiff has presented no evidence that would support his claim that defendants' employment decision was based on race. What is clear from the record is that there is no direct or indirect evidence of plaintiff's race being a factor in defendants' decision-making process at any level. The only "evidence" plaintiff has proffered is his own subjective and speculative belief that he was discriminated against.

■ At best, the speculation and conjecture contained in the pleadings raises a mere possibility of discrimination rather than the reasonable probability that is necessary to support an inference of discrimination. *Lovelace v. Sherwin–Williams, supra*, at 241–42. Speculative assertions that defendants' motivation was racial is not enough to withstand summary judgment. *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir.1988). Conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment, *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir.1987); and unsupported allegations "do not confer talismanic immunity from Rule 56," *Ross v. Communications*

*Satellite Corp.*, 759 F.2d 355, at 365 (4th Cir.1985). For the foregoing reasons, the court will grant defendants' motion for summary judgment.

■ Even if this court were to assume that a *prima facie* case had been shown, the burden would shift back to defendants to articulate a nondiscriminatory reason for their decision. Defendants have articulated a legitimate, nondiscriminatory reason for their decision, *i.e.*, a written policy that prohibits employees from engaging in outside employment while on medical leave. On its face, that policy treats race neutrally.

Inasmuch as defendants have articulated a legitimate, nondiscriminatory reason for firing plaintiff, the onus of proof shifts back to plaintiff to show that he was a victim of intentional race discrimination. That burden can be satisfied by showing that the reason defendants have put forward is a mere pretext for discrimination and that the plaintiff's race is the more likely reason that he was terminated. *Herold v. Hajoca Corp., supra.*

As discussed above in the context of ERISA, there is absolutely no evidence before this court that indicates that defendants' given reason—violation of a work rule—is pretext for discrimination. It is undisputed that at the time the decision was made, "the perception of the decision-maker" was that plaintiff had violated a work rule that required his termination. *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980). While plaintiff has submitted mileage logs, affidavits, and other evidence, including some that shows he did not have the best working relationship with his supervisor, none of that evidence could result in any inference that Shepler decided to terminate plaintiff based on his race. Whether plaintiff was actually driving for hire at the time is simply not relevant, because no matter how erroneous

or ill-advised an employer may be in his decision to terminate an employee, such a misstep would be no proof of racial animus. Indeed, the decision maker in this matter had before him substantial evidence of a violation of a work rule, which had required the same decision maker to terminate the employment of Caucasian employees. While the report of the private investigator is not without fault, the decision maker had independent reports from other employees he perceived as trustworthy, including a report from an employee who also worked as a driver for plaintiff. Finding that no evidence has been presented that could lead a reasonable finder of fact to find that race was more probably the reason plaintiff was fired, the court will grant defendants' Motion for Summary Judgment. A judgment reflecting this decision is filed simultaneously herewith.

## V. Other Pending Motions

Plaintiff's Motion to Amend Response elicited defendants' Motion to Strike Affidavits, a Motion for Sanctions, and a Motion to Disqualify Counsel. Plaintiff then requested a hearing on defendants' motions to strike, for sanctions, and to disqualify. Quite properly, defendants' motions point out the shortcomings of plaintiff's motion, including the misleading statements concerning consultation of opposing counsel and the ethical prohibition on counsel becoming a witness. The court, however, will deny defendants' motions without a hearing, inasmuch as it appears that the referenced missteps were unintentional and the errors harmless. Having considered all of the evidence and arguments presented by plaintiff, the court finds that he has not satisfied his burden of showing that a genuine issue of material fact remains for trial. This court is convinced that the only evidence plaintiff has to support either claim is his belief that his violation of a work rule was not the real reason for his termination. ERISA, Title VII, and Section 1981 secure important rights intended to provide for a level playing field in the workplace. In order to invoke such rights, a plaintiff must be able to come forward with some evidence that the reason given for his termination was not only false, but was a pretext for discrimination. Because such important rights are at stake, a subjective belief is not enough to go forward because it would require a jury to make a decision based upon what a party believes to be a fact rather than upon what a party knows to be a fact.

## VI. Conclusion

Finding that no genuine issue of material fact remains for trial, the court will grant defendants' Motion for Summary Judgment. A judgment is entered simultaneously herewith in favor of defendants and against plaintiff providing that plaintiff have and take nothing of these defendants. All other motions now pending will be denied.