**KEYSTONE INSURANCE COMPANY**

v.

**Joseph HOUGHTON, Donna Houghton, John Cassidy, Kathleen Cassidy and Frank Livoy.**

**Civ. A. No. 86–4327.**

United States District Court, E.D. Pennsylvania.

April 19, 1988.

█

---

Elizabeth K. Ainslie, Philadelphia, Pa., for plaintiff.

Gilbert J. Scutti, Thomas Carroll, Patricia Carroll, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

Plaintiff claims that the defendants defrauded from it a sizable amount of money by filing bogus insurance claims. The complaint is premised on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and a pen-

dent common law fraud claim. Plaintiff Keystone Insurance Co. asserts that the defendants, who shall be referred to collectively as the "Houghton Group," engaged in a pattern of racketeering activity against various insurance carriers, filed false claims against Keystone in connection with two motor vehicle accidents—one occurring on November 19, 1977, and the second on July 7, 1980—and that the defendants' conduct injured the plaintiff to the tune of $82,891.55. This action was filed on July 22, 1986.

Before the commencement of this action, the United States initiated a criminal prosecution against the defendants. The criminal indictment charged the defendants with various acts of mail fraud. Count Sixteen of that indictment charged Joseph Houghton, John Cassidy, and Kathleen Cassidy with mail fraud in connection with a July 6, 1981, letter sent to Keystone. Following a trial before Judge Luongo, the jury found the defendants guilty on this and other counts.

Defendant Joseph Houghton appealed his conviction. The Third Circuit affirmed. Recently, the Supreme Court denied his request for a writ of certiorari. *U.S. v. Houghton*, Crim. No. 85–349 (E.D.Pa.1986), *aff'd mem.*, 829 F.2d 31 (3d Cir. August 10, 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1014, 98 L.Ed.2d 979 (February 22, 1988).

This action was tried to the Court. During the one day bench trial plaintiff's counsel introduced into evidence the transcript, various documents, and tape recordings from the criminal trial.[1] Plaintiff also presented evidence concerning its damages. Turning to the defendants, the Cassidys also moved into evidence designated portions of the criminal trial transcript. The Cassidys did not dispute that the criminal conviction controlled with respect to the July 6, 1981, mailing. The Houghtons attempted to show that the 1977 accident did, indeed, injure Mrs. Houghton and that various claimed expenses were legitimate. The Houghtons also argued that the statute of limitations bars plaintiff's action. Following the bench trial, I permitted all counsel to submit proposed findings of fact and conclusions of law.

I have reviewed the considerable body of evidence before me. Following that review and the termination of Joseph Houghton's appeal, I am now prepared to issue my findings of fact and conclusions of law. Since counsel have emphasized various factual issues rather than the applicable requirements and standards, I believe it appropriate to first set forth the legal framework within which this case rests.

## I. DISCUSSION

Plaintiff bases its first claim on 18 U.S.C. §§ 1962(c) and 1964(c). Complaint at ¶¶ 1, 20, 21. Section 1964(c) provides parties with a civil remedy if they have been injured by a violation of section 1962. Section 1962(c), in turn, prohibits any person from being employed by or associated with an enterprise and conducting or participating in that enterprise's affairs through a pattern of racketeering activity.

To prevail then under sections 1962(c) and 1964(c), the plaintiff must prove that (i) a person conducted, (ii) an enterprise, (iii) through a pattern, (iv) of racketeering activity, and (v) that the defendant's acts injured the plaintiff. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–7, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346, 358–9 (1985); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263 (3d Cir. 1987) (discussing enterprise, pattern, and injury requirements). Also, the injured party must file the complaint within four years from the date on which the action accrued. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (hereinafter *"Malley–Duff"*). As the parties have failed to adequately address the parameters of the above requirements and

---

1. The Cassidys' counsel did not object to the admission of evidence from the criminal trial. The Houghtons, however, did object to the admission of the transcript from the criminal trial on the basis that it violated the hearsay rule. I found that the transcript fell within the catch-all exception to the hearsay rule, Fed.R.Evid. 803(24), and therefore rejected the Houghtons' arguments. *See* Order dated November 9, 1987.

demonstrate the presence or absence of the requirements in the present case, I now turn to review the applicable law.

### A. Standing and Injury.

 A plaintiff has standing under § 1964(c) if the injury flows from the commission of a predicate act; the injury need not result from a pattern of predicate acts. *Town of Kearny*, 829 F.2d at 1268. To require a plaintiff to have suffered injury from each of the predicate acts would, in the words of the Seventh Circuit, "conflate what must be two separate inquiries: first, was there a pattern of racketeering activity violating RICO, and second, was the plaintiff injured by some or all of the activities comprising the RICO violation?" *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, (7th Cir.1987) (quoted in *Town of Kearny*, 829 F.2d at 1268). Of course, the plaintiff must also prove that a predicate act or acts were the proximate cause of the injury. *Sedima*, 473 U.S. at 496–7, 105 S.Ct. at 3285, 87 L.Ed.2d at 359 (referring to *Haroco Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437, (1985)); *accord In re Gas Reclamation, Inc. Securities Litigation*, 663 F.Supp. 1123 (S.D.N.Y.1987).

### B. Enterprise.

The person must be either employed by or associated with an enterprise.[2] A completely illegal organization, which the Houghton Group is alleged to be, may constitute an enterprise for RICO purposes. *U.S. v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). In addition, the defendant who is alleged to be the person must be associated with a separate enterprise. *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633–4 (3d Cir.

**2.** Section 1961(4) provides that:
> [an] "enterprise" includes any individual, partnership, corporation association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

**3.** Section 1961, the definitional section, provides:

1984); *cf. Town of Kearny*, 829 F.2d at 1266; *U.S. v. DiGilio*, 667 F.Supp. 191, 194–6 (D.N.J.1987).

Following the *Turkette* decision, courts sought to refine the term "enterprise" so as to prevent its overbroad application. In *U.S. v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied sub nom. Ciancaglini v. U.S.*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145, (1983), the Third Circuit Court of Appeals set forth the criteria to determine whether or not an enterprise exists. Plaintiff must demonstrate to the finder of fact (i) an ongoing organization with some sort of framework for making or carrying out decisions, (ii) that the associates function as a continuous unit performing certain roles to benefit the enterprise, and (iii) that the enterprise has an existence separate and apart from the pattern of racketeering activity in which it engages. The enterprise may make or execute its decisions either through a hierarchical system or consensus. The third requirement does not envision some function wholly unrelated to the racketeering activity; rather, it simply requires that the enterprise have an existence beyond that needed to commit the predicate racketeering acts. Indeed, as the Third Circuit noted, proof that an enterprise oversaw and coordinated the commission of several different predicate acts and other activities would satisfy this separate existence requirement. 709 F.2d at 221–4; *accord Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 789–90 (3d Cir.1984).

I will now briefly review the oft-discussed pattern of racketeering activity requirement.

### C. Pattern of Racketeering Activity.

 RICO prohibits persons from acting through a pattern of racketeering activity.[3]

> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

In turn, section 1961(1)(B) defines racketeering activity as:

Footnote fourteen of *Sedima* has taught us that two predicate acts may not be sufficient to establish a pattern of racketeering activity.

> Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "the target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to form a pattern."

*Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358 n. 14 (citation and emphasis omitted).

In the wake of *Sedima*, the Third Circuit Court of Appeals has held that there is no rigid rule for determining the presence or absence of a pattern; rather, courts must make a case-by-case analysis. Factors relevant to the case-by-case analysis include, but are not limited to, the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity. *Barticheck v. Fidelity Union Bank*, 832 F.2d 36, 39 (3d Cir. 1987); *accord Marshall–Silver Construction Co. v. Mendel*, 835 F.2d 63, 66 (3d Cir.1987). As noted above, courts may look beyond the predicate acts which allegedly injured the plaintiff to determine whether or not a pattern existed. *Town of Kearny*, 824 F.2d at 1268.

### D. *When Does a RICO Cause of Action Accrue?*

■ A plaintiff must file a civil RICO cause of action within four years from the date that the action accrued. The question which still faces federal courts is: when does a civil RICO cause of action accrue? *Malley–Duff*, 792 F.2d 341 (3d Cir.1986),

*aff'd on different grounds*, 483 U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121, 134 (1987) ("[W]e have no occasion to decide the appropriate time of accrual for a RICO claim."). The Third Circuit has not addressed this question.[4] 792 F.2d at 341. Accordingly, a brief review of the evolving case law on this question is appropriate.

There appear to have been four different answers put forth by various federal courts. I shall refer to them as: (i) the discovery rule; (ii) the Clayton Act rule; (iii) the last predicate act rule; and (iv) the last injury discovery rule.

Before delving into each rule, I believe it is important to distinguish between two types of RICO cases. One type—commonly referred to as a "garden variety" claim—involves a single injury caused by two or more predicate acts. The second type involves multiple injuries caused by multiple predicate acts. As discussed below, I believe that a different accrual rule exists for each type of claim.

The discovery rule adopts the general federal rule of accrual and simply applies it to civil RICO claims. This rule holds that a civil RICO claim arises whenever the plaintiff knows or should have known of the injury. The Ninth Circuit has followed this rule for approximately four years. That court first faced the issue in *Compton v. Ide*, 732 F.2d 1429 (9th Cir.1984). A central issue on appeal was whether a civil RICO cause of action accrues when the plaintiff knows the identity of all the alleged conspirators or when the plaintiff knows or should have known of the alleged injury. The *Compton* court reasoned that since 18 U.S.C. 1964(c) focused on an injury to one's property or business "as opposed to the existence of a criminal conspiracy ... the normal federal rule on accrual should apply to civil RICO actions alleging conspiracy." 732 F.2d at 1433; *accord Volk v. D.A. Davidson Co.*, 816 F.2d 1406 (9th Cir.1987) (following *Compton* in an action involving

---

any act which is indictable under any of the following provisions of Title 18 United States Code ... section 1341 (relating to mail fraud)....

4. In their post-trial submissions, counsel failed properly to address this crucial issue.

securities fraud which caused a single injury to each investor).

Three other Circuit Courts of Appeals have adopted the discovery rule. *Alexander v. Perkin Elmer Corp.*, 729 F.2d 576 (8th Cir.1984) (per curiam); *Bowling v. Founders Title Co.*, 773 F.2d 1175, 1178 (11th Cir.1985) (In a case involving several acts of mail and wire fraud but individual injuries to plaintiff-investors, the Eleventh Circuit rejected the district court's application of last predicate act test and applied the discovery rule as "consistent with our practice in related fraud and securities cases."); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir.1987) (following *Compton* without discussion). Various district courts likewise have followed the discovery rule as expressed in *Compton. Lawaetz v. Bank of Nova Scotia*, 653 F.Supp. 1278, 1292 (D. Virgin Islands 1987); *Gonzalez v. Katz*, Civ. No. 86–7254, slip op. (E.D.Pa. August 13, 1987) (available on WESTLAW, 1987 WL 15677). Most of these opinions have not examined alternatives to the discovery rule in the context of multiple RICO injuries or have simply followed the *Compton* decision.

Following *Malley–Duff* the Ninth Circuit reaffirmed *Compton. State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4 (9th Cir.1987). The panel's opinion noted that *Malley–Duff* did not address the question of when a RICO cause of action commences and remanded the case to the district court to reconsider the statute of limitations question in conformity with *Malley–Duff* and *Compton.* Writing separately, Judge Kennedy explained how the *Compton* rule would operate in situations where some injuries were sustained within the limitations period and other injuries were sustained outside of the limitations period. He stated: "[t]he rule is that a cause of action accrues when new overt acts occur within the limitations period, even if a conspiracy was formed and other acts were committed outside the limitations period.... A corollary rule is that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period." *Id.* at 5 (citations omitted). Nonetheless, Judge Kennedy readily acknowledged that this separate accrual rule had not been adopted by the Supreme Court in *Malley–Duff* or by the Ninth Circuit.

The second rule, the Clayton Act rule, has been adopted thus far in only one reported decision. *Armbrister v. Roland Intern. Corp.*, 667 F.Supp. 802 (M.D.Fla. 1987). There, the court's rationale depended heavily on the Supreme Court's decision in *Malley–Duff* to adopt the Clayton Act limitations period and apply it to RICO; however, the uniqueness of the RICO statute with all its prerequisites and the fact that multiple injuries could result from a single pattern of racketeering activity argue against the incorporation of the Clayton Act accrual rule.[5]

The last predicate act rule holds that limitations period for a RICO claim runs from the date of the last overt act. Under this rule as long as the complaint was filed within four years of the last predicate act, the plaintiff could still recover for injuries caused by other predicate acts which occurred outside the limitations period. *See County of Cook v. Berger*, 648 F.Supp. 433 (N.D.Ill.1986) (relying on *U.S. v. Field*, 432 F.Supp. 55, 59 (S.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1371 (2d Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978)); *accord Charter Oak Ins. Co. v. Domberg*, Civ. No. 83–4522, slip op. (N.D.Ill. August 3, 1987) (available on WESTLAW, 1987 WL 15413) (application of last predicate act rule to RICO complaint alleging an insurance fraud). The rationale behind this rule rests on "the federal interest in providing relief to those who are injured by a course of continuous and related conduct[; accordingly] it would be incongruous to bar, on statute of limitations grounds, recovery for

---

5. For the record, I note that Chief Judge Fullam referred to and applied the Clayton Act rule and the discovery rule. *See 5 Penn & Co. v. Shearson Lehman Bros.*, Civ. No. 87–1357, slip op. (E.D.Pa. November 3, 1987) (available on WESTLAW, 1987 WL 19591) (citing to *Armbrister*). Judge Fullam, however, did not adopt either rule as the claim was untimely under both rules.

predicate acts taking place outside the limitations period and permitting recovery only for those within the limitations period." 648 F.Supp. at 435. Since RICO attacks continuous schemes the limitations period should commence only when the pattern of acts causing the specified injury ceases. *Charter Oak Ins., supra.*

In marshalling an argument in support of the last predicate act rule, the court in *County of Cook* confronted *Compton* and declined to follow that decision. According to *County of Cook, Compton* "confuses the injurious RICO violation, a pattern of illegal conduct, with its civil remedy. It is the nature of this prolonged, continuing offense which is the primary determinant of plaintiff's injury and which should govern the initiation of the statute of limitations." *Id.* at 434 n. 1.

I would submit that the primary determinant of an injury is not the pattern but the specific predicate act or acts which proximately caused it. This conclusion flows from the consideration that under section 1964(c) it is not the pattern itself which is actionable but the injury caused by a predicate act or acts. *Town of Kearny, supra; Marshall & Ilsky, supra.* To delay the accrual of a claim until the commission of the last predicate act where such predicate act does not injure the plaintiff is to retreat from the focus of section 1964(c).

The fourth rule, the last injury discovery rule, holds that the limitations period runs from the date that the plaintiff knew or should have known of the last injury caused by a predicate act. *Bankers Trust Co. v. Feldesman,* 648 F.Supp. 17, 35–6 (S.D.N.Y.1986), *on reargument,* 676 F.Supp. 496 (S.D.N.Y.1987) (application of rule to a third amended complaint); *cf. Morey v. Bravo Productions, Inc.,* Civ. No. 85–10091 slip op. (S.D.N.Y. December 2, 1987) (available on WESTLAW, 1987 WL 28526) (stating that the general rule as expressed in *Compton* does not apply in RICO actions where plaintiff suffered multiple injuries and citing to *Bankers Trust* ). In a well-reasoned analysis, the *Bankers*

*Trust* court submitted that the *Compton* discovery rule may be inadequate for some RICO claims.[6] First, a plaintiff may be injured by a single predicate act before he would have a right to sue under RICO. Under the discovery rule, the cause of action for the injury caused by this first predicate act would accrue as soon as the plaintiff knew or should have known about the injury even if the other injury-causing predicate acts occurred later. Thus, the discovery rule would start the limitations period before the commission of later predicate acts. Yet, until the defendant commits at least a second predicate act, there can be no pattern, no violation of § 1962, and no RICO cause of action. *See* 18 U.S.C. § 1961(5). A second reason why the discovery rule may not be well suited to some RICO claims is that some claims may involve multiple injuries. These multiple injuries could very well result from a single pattern of racketeering activity. If the pattern continued over a number of years, the plaintiff might very well be unable to recover for the earlier injuries. *Bankers Trust* noted that federal courts have recognized an exception to the discovery rule—which usually applies to single injury scenarios—where the conduct is continuous; accordingly, where a defendant's conduct evidences a continuous practice, the action will be considered timely as long as one of the acts falls within the limitations period. 648 F.Supp. 35–6. To hold otherwise, in the context of multiple-injury RICO claims, would encroach upon and limit a legislatively enacted scheme to provide recovery for racketeering injuries. *See* 18 U.S.C. §§ 1961(5); 1964(c).

The last injury discovery rule is most appropriate for determining the accrual of a RICO claim which involves multiple injuries. This is so because a plaintiff cannot sue until the defendant has committed at least two predicate acts and the application of the discovery rule may shut off a remedy for a prior injury resulting from the same pattern of racketeering activity. The application of the last injury discovery rule

**6.** The court acknowledged that for "garden variety" RICO claims—those involving a single injury—the discovery rule may suffice. 648 F.Supp. at 36 n. 8.

to multiple injury cases would still permit the application of the general discovery rule to RICO claims involving a single injury arising from two or more predicate acts committed in the same time frame. As this case involves multiple injuries and predicate acts over a period of time, I shall apply the last injury discovery rule to Keystone's RICO claim.

### E. *Common Law Fraud.*

Keystone also seeks to recover on the alternate theory of common law fraud. The essential elements of fraud include: (1) a misrepresentation; (2) a fraudulent utterance of the misrepresentation; (3) an intention by the maker that the recipient would be induced to act or rely on the misrepresentation; (4) justifiable reliance; (5) damages suffered as a proximate cause of the recipient's justifiable reliance. *Warren Balderston Co. v. Integrity Trust Co.*, 314 Pa. 58, 170 A. 282 (1934); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 464 A.2d 1243 (1983) (citing cases). Pennsylvania's six year statute of limitations controls for the present common law fraud claim as the claim accrued before February, 1983. *A.J. Cunningham Packing v. Congress Financial Corp.*, 792 F.2d 330 (3d Cir.1986); 42 Pa.C.S.A. §§ 5524(7), 5527 (Purdon Supp.1987).

I will now turn to the findings of fact. My findings are based on the entire record. In some instances I have cited to especially pertinent sections of the record.

## II. FINDINGS OF FACT

### A. *The Cast of Characters.*

1. Plaintiff Keystone Insurance Company ("Keystone") is a corporation formed and existing under the laws of Pennsylvania and has its principal place of business in Philadelphia, Pennsylvania. Plaintiff issued insurance policies of various sorts to defendants at various times between 1977 and 1984. Edward D'Imperio, 4/10/86, pp. 89–102 and exhibits referred to therein. Mr. D'Imperio works for Keystone as a vice-president in charge of claims administration.

2. Defendant Joseph Houghton has been married to defendant Donna Livoy–Houghton since March, 1978. His mother Mary Houghton, lived with Joseph Houghton at 3020 Eisenhower Drive, East Norriton Township, Pennsylvania. Patricia Jones, 4/3/86, p. 62.

3. Defendant Donna Livoy–Houghton, wife of Joseph Houghton, is the daughter of defendant Frank Livoy and the sister of Lynda Livoy. P. Jones, 4/3/86, p. 64. She lived at 3020 Eisenhower Drive in East Norriton since before November 19, 1977. Dean Stewart, 4/9/86, p. 92.

4. Defendant John Cassidy is a friend of defendant Joseph Houghton. He is married to defendant Kathleen Cassidy. In 1978, they lived at 851 Cedar Court, Bensalem, Pennsylvania. Between 1978 and at least 1981 they lived at 3352 Bryan Court in Bensalem, Pennsylvania. Kathleen Cassidy is a close friend of Donna Houghton's. Judy Kaminsky, 4/4/86, pp. 155–158; Benjamin Zuckerman, 4/15/86, pp. 9–184 to 9–185; D'Imperio 4/10/86, p. 91.

5. James "Skip" Oliver, Esquire, acted as an attorney for these defendants, for Mary Houghton and for Christine Johannes–Friedrich in connection with claims against various insurance companies, including the plaintiff. Christine Johannes–Friedrich, 4/2/86, pp. 25–28, 85; Thomas Curry, 4/3/86, pp. 169, 182; Government Exhibit 3A, D'Imperio, 4/10/86, p. 93; John Collins, 4/14/86, p. 99; Recorded Conversation, December 6, 1983, Transcript No. 19—Albeser, 4/18/86, pp. 5–8 to 5–12.

6. Philip Pearlstein, D.O., acted as a physician for Joseph Houghton, Donna Livoy–Houghton, and John Cassidy in connection with injuries supposedly sustained in accidents which were the basis of claims against insurance companies, including the plaintiff. Thomas Curry, 4/3/86, pp. 178–79; D'Imperio, 4/10/86, pp. 90, 100; Henry Boettjer, 4/18/86, pp. 12–63.

7. Dr. J.R. Christy acted as a chiropractor for Joseph Houghton, Donna Livoy–Houghton, and John Cassidy in connection with the injuries supposedly sustained in accidents which were the basis of claims agiainst insurance companies, including the

plaintiff. Karen Nephin, 4/3/86, p. 156; Thomas Curry, 4/3/86, pp. 178–9.

### B. *The November, 1977, Accident.*

8. On March 3, 1977, Keystone provided Donna Livoy–Houghton with an automobile insurance policy. Government Exhibit 3–M. That policy applied to a 1977 Lincoln Continental, VIN 7Y89A925836, and would cover bodily injury, property damage, uninsured motorist accidents, and no-fault incidents (PIP). The no-fault clause would provide medical coverage, $15,000 for wage losses, and approximately $9,000 for replacement services. Adamitis, 4/4/86, pp. 22–3.

9. On November 19, 1977, while in Cherry Hill, New Jersey, defendant Joseph and Donna Livoy–Houghton were involved in an minor automobile accident. Donna Livoy–Houghton's Lincoln Continental, VIN 7Y89A925836, bumped the car in front of it, a Toyota Celica, driven by Robert Bell. The Houghtons' auto was then bumped by an automobile driven by one Bernice Rosenfeld.

10. Plaintiff concedes that there was contact between the Rosenfeld and Houghton vehicles.

11. The jury's verdict in the criminal action did not directly speak to the Houghton's conduct with respect to this accident.

12. The contact between the three cars was very slight. Robert Bell, 4/3/86, pp. 140–50. Mr. Bell, the driver of the Celica, described the impact of the Lincoln into the Celica as "very slight" and that of the Rosenfeld car into the Lincoln as "[a]lmost to the point where you couldn't feel it." *Id.* at 141.

13. Immediately after the accident, Donna Livoy–Houghton did not evidence any signs of physical injury. *Id.* at 143, 149.

14. Mr. Bell examined the points of contact on the various cars and saw no damage. *Id.* at 142, 146, lines 6–15.

15. Besides the individuals in the three automobiles, no one else witnessed the accident. Mr. James O'Neill did not accompany the Houghtons and did not witness the accident. *Id.* at 140–50. Officer Randall Selah, 4/14/86, pp. 21–4.

16. Neither Donna Livoy–Houghton nor Joseph Houghton were injured in the November, 1977, accident.

### C. *The Houghtons' Claims for the 1977 Accident.*

17. Following the accident, Joseph Houghton and Donna Livoy–Houghton devised a scheme to defraud money from various insurance companies, including the plaintiff.

18. Donna LIvoy–Houghton and Joseph Houghton each reported the accident to Keystone. Donna Livoy–Houghton reported the accident on November 22, 1977. Government Exhibit 3–0.

19. On January 3, 1978, Donna Livoy–Houghton submitted a claim to Keystone for this accident. *See generally* Sue Adamitis, 4/14/86, pp. 21–43; Government Exhibit 3–P (claim number 07–327890). On February 27, 1978, Joseph Houghton filed a claim against Keystone. *See generally* Sue Adamitis, 4/14/86, pp. 35–7; Government Exhibit 3–PP. Both claims were based on the November, 1977, accident.

20. Keystone never paid any money to Joseph Houghton in connection with the November, 1977, accident. Sue Adamitis, 4/14/86, pp. 37–8.

21. Joseph Houghton also filed a claim against Great American Ins. Co. The Houghtons also filed a claim against New Jersey Manufacturers Insurance Co. Thomas Curry, 4/3/86, pp. 170–1.

22. The claims against Keystone contained various misrepresentations or material omissions. These included: (i) the Houghtons sustained significant injuries in that accident, Sue Adamitis, *supra,* pp. 23–8; Karen Nephin, 4/3/86, pp. 153–165; Thomas Curry, 4/3/86, pp. 167–182; Edward C. D'Imperio, 4/10/86, pp. 89–90, Exhibits 3–0, 3–P, 3(hh), 3(ii) and 3(jj); Fred Fletcher, 4/10/86, pp. 34–39; (ii) James O'Neill witnessed the accident; (iii) the concealment of the fact that James O'Neill was a friend of the Houghtons, Fred Fletcher, 4/10/86, pp. 34–39; Randall Sel-

ah, 4/14/86, p. 23; Thomas Curry, 4/3/86, pp. 174–81; Patricia Jones, 4/3/86, pp. 61–62; Karen Nephin, 4/3/86, p. 154; and (iv) Joseph Houghton did not drive a car and no one else in his household owned a car or had an auto liability policy, Sue Adamitis, 4/4/86, pp. 37–8; Karen Nephin, 4/3/86, pp. 152–162, Government Exhibit 3–QQ.

23. In connection with the November, 1977, accident, plaintiff sent a wage and salary verification form to Biggins Shore & Guerra, to verify what Donna Livoy–Houghton did for a living, what time she lost from the job, and what her salary was. The form was addressed to the attention of Christine Johannes–Friedrich. For seven months during which Donna Livoy–Houghton claimed to be disabled she was pregnant. D'Imperio, 11/16/87, p. 30; Government Exhibit 3–R (Wage & Salary Verfication Form); Adamitis, *supra*, pp. 28–9; Donna Livoy–Houghton, 11/16/87, pp. 138–9. Donna Livoy–Houghton claimed that the accident prevented her from earning $6,000 as a real estate sales associate.

24. Donna Livoy–Houghton also claimed the 1977 accident aggravated a hemorrhoid condition and necessitated a hemorrhoidectomy. D'Imperio, 11/16/87, pp. 29–30; Donna Livoy–Houghton, 11/16/87, pp. 136–7.

25. In connection with the November, 1977, accident, Donna Livoy–Houghton swore that she had never been in an accident before. Fred Fletcher, 4/10/86, p. 39. In fact, she had been in an accident five months before in which she backed her car into Joseph Houghton's car in the King of Prussia Shopping Center parking lot. Sue Adamitis, 4/4/86, pp. 39–41; Government Exhibits 2–A, 2–B, 2–C, 2–D.

26. By claiming to have been injured in the November, 1977, accident, defendant Donna Livoy–Houghton could receive not only compensation for medical treatment but also (a) payment for lost wages, D'Imperio, 11/16/87, p. 29, (b) payment for "replacement household services," Christine Johannes–Friedrich, 4/2/86, pp. 22–4, and (c) payment for her "pain and suffering" on account of the accident, Thomas Curry, 4/3/86, pp. 182–3.

27. In connection with the November, 1977, accident, Donna Livoy–Houghton claimed that Christine Johannes–Friedrich had performed household replacement services for her for two hundred days between November 28, 1977, and March 3, 1979, and requested $7,495 for the replacement services. Dean Stewart, 4/9/86, pp. 82–96; Government Exhibit 3(LL). Christine Johannes–Friedrich had not performed any such services for Donna Livoy–Houghton, but Donna Livoy–Houghton paid her $100 or $200 to say she had. Christine–Johannes Friedrich, 4/2/86, pp. 22–35. Ms. Houghton's request for compensation for such services constituted an illegitimate claim for replacement service as she was not injured.

28. In connection with the November, 1977, accident, one of the items of replacement services that Donna Livoy–Houghton claimed was work allegedly performed by Jack Cassidy in an amount of $300. Dean Stewart, 4/9/86, pp. 82–83; Government Exhibit 3(LL). This was not a legitimate claim as Donna Livoy–Houghton was not physically injured in the accident.

29. In connection with the November, 1977, accident Donna Livoy–Houghton claimed that Paint Galore provided replacement services. These services amounted to $1,020. These services included the painting of the entire exterior of a beach house, cottage, and breezway. *See* Government Exhibit 3(LL); Donna Livoy–Houghton, 11/16/87, pp. 150–2. I am unable to credit Ms. Livoy–Houghton's testimony that she would have done all the painting herself had she not been "injured". Based on this determination and the fact that Livoy–Houghton was not injured, I find that the claim for Paint Galore's services did not constitute legitimate replacement services under the Keystone insurance policy.

D. *The Mailings Relevant to the 1977 Accident.*

30. Keystone's last payment to Donna Livoy–Houghton in connection to the November, 1977, accident came on July 10, 1980. *See* note 7, *infra*. Therefore, any mailings after that date could not have

caused injury to Keystone and cannot be considered as a predicate racketeering act which proximately caused an injury to Keystone.

31. Based on the present record, it cannot be said that Donna Livoy–Houghton's letter of May 14, 1980, to Keystone requesting an itemization of Keystone's payments (Plaintiff's Exhibit A) and Donna Livoy–Houghton's authorization made on December 28, 1982, for the release of records (Plaintiff's Exhibit B) were knowingly placed in the United States mails in furtherance of a scheme to defraud Keystone.

32. Donna Livoy–Houghton and Joseph Houghton either placed, or caused to be placed, the following matters in the United Stated mails: the letter from Northwest Surgical Associates dated May 26, 1978, and addressed to Keystone (Plaintiff's Exhibit P; *see also* D'Imperio, 11/16/87, at pp. 124–5), Donna Houghton's letter to the president of Keystone dated November 28, 1978, requesting prompt payment for her "losses" caused by the accident (Plaintiff's Exhibit Q; *see also* D'Imperio, 11/16/87 at pp. 125–6), Donna Livoy–Houghton's application for no-fault benefits (Government Exhibit 3–P), Donna Livoy–Houghton's letter to Sue Adamitis (Government Exhibit 3–KK) claiming that work performed by Lincoln Enterprises around the Sea Isle beach home constituted replacement services, and Joseph Houghton's application to Keystone for benefits (Government's Exhibit 3–PP).

33. The matters identified in finding of fact 32 were all placed in the United States mails in furtherance of a scheme to defraud Keystone of money. The Houghtons intentionally placed or caused the placement of such matters in the mails.

34. The conduct of Donna Livoy–Houghton and Joseph Houghton described in findings of fact 32 and 33 constituted violations of 18 U.S.C. §§ 1341, 2.

35. In January, 1980, Joseph Houghton swore in a deposition that he had never had any physical problems, had never treated and was symptom-free before September, 1978, and had never been in any automobile accident before September, 1978. Charles Menszak, 4/9/86, pp. 186–9. Between November, 1977, and January 30, 1978, however, Joseph Houghton was claiming to be totally disabled from working, on account of injuries sustained in the November, 1977, accident. Sue Adamitis, 4/4/86, p. 36; Karen Nephin, 4/3/86, pp. 156–157.

E. *Keystone's Injuries From the 1977 Accident.*

36. Keystone claims that it lost $30,-894.55 on account of claims made by Joseph and Donna Livoy–Houghton based on the November, 1977, accident. Of this figure, $25,330.75 was paid out to Donna Livoy–Houghton, her lawyers and doctors, and the balance represents expenses incurred by Keystone in investigating and defending against the claim. D'Imperio, 11/16/87, p. 46; Plaintiff's Pretrial Memorandum at p. 5.

37. Keystone issued various drafts in connection with Donna Houghton's claims. *See* Government Exhibits 3–Q to 3–GG Adamitis, *supra*, pp. 28–33. Keystone paid no money to Joseph Houghton. Adamitis at p. 38.

38. Plaintiff presented no evidence which indicated that the Cassidy defendants had any involvement in the November, 1977, accident or in the subsequent bilking of Keystone in connection with that accident. *See* D'Imperio, 11/16/87, p. 77.

39. Since Donna Livoy–Houghton was not injured in the November 19, 1977, accident, she improperly collected $25,330.75[7]

---

7. This figure is derived from adding the following drafts:

| Draft # | Date Issued | Amount | Exhibit |
|---------|-------------|--------|---------|
| A183296 | 2/11/78 | $ 126.67 | 3–Q |
| A184934 | 2/13/78 | $ 1,799.71 | 3–R |
| A184935 | 2/13/78 | $ 27.00 | 3–S |
| A183861 | 2/16/78 | $ 45.00 | 3–T |
| 846241 | 2/23/78 | $ 10.09 | 3–U |
| 850273 | 3/14/78 | $ 485.00 | 3–V |
| 854119 | 3/31/78 | $ 833.20 | 3–W |
| 867955 | 5/26/78 | $ 430.00 | 3–X |
| 869293 | 6/07/78 | $ 405.07 | 3–Y |
| 869292 | 6/07/78 | $ 91.00 | 3–Z |
| 871482 | 6/14/78 | $ 321.28 | 3–AA |
| 888759 | 9/05/78 | $ 220.00 | 3–BB |
| 890769 | 9/11/78 | $ 880.00 | 3–CC |

from plaintiff. D'Imperio, 11/16/87, p. 46; Plaintiff's Exhibit D (claim number 07–327890). The last check was issued by Keystone on July 10, 1980.

40. With respect to the November, 1977, accident Keystone claims that it also suffered $5,563.80 in ancillary costs. Plaintiff's Pretrial Memorandum, at p. 5. These costs include: $1,003.80 for attorney fees, D'Imperio, 11/16/87, p. 50; $410.00 for adjusters, *id.;* $150.00 in photocopying charges; and $4,000.00 in administrative time, *id.* pp. 51–2. Plaintiff's claim for $4,000 to cover the administrative costs lacks an itemization of hours spent and individualized hourly rates, *id.* at 72–3.[8] Plaintiff also offered no evidence to support the photocopying charges.

41. Keystone and the Houghtons settled the dispute arising from the 1977 accident in August, 1979. D'Imperio, 11/16/87, p. 64. Thereafter, Keystone issued a $15,000 draft to the Houghtons on August 8, 1979. *See* Government Exhibit 3–II.

### F. *The July, 1980, Accident.*

42. On February 6, 1980, John Cassidy bought automobile insurance policy from Keystone. *See* Government Exhibit 18–C. The policy number was 05005655. This policy provided coverage for bodily injury, property damage, uninsured motorists, and no-fault incidents.

43. John Cassidy then sought to increase his no-fault coverage. *See* Government Exhibit 18–D.

44. In the summer of 1980, Joseph Houghton asked Christine Johannes–Friedrich to "fly to Florida and witness a scam," "a setup accident on a desolate road where

two cars would hit, but nobody would really be hurt ..." Christine Johannes–Friedrich, 4/2/86, pp. 19–20. She declined his request.

45. In June of 1980, "J. Cassidy" made travel arrangements for himself and his brother, sometimes cousin, "T. Cassidy," to fly from Miami, Florida, to Freeport in the Bahamas on July 6, 1980. Jaclyn Hart, 4/10/86, pp. 140–145.

46. On July 5, 1980, a "T. Cassidy" registered for a room at the Carillon Hotel, Miami, Florida, along with John and Kathleen Cassidy. Paul Bromberg, 4/21/86, pp. 13–31. On that same day, according to defendant Kathleen Cassidy, she saw "Tom Cassidy" sign an Avis car rental contract at the Miami airport. John Collins, 4/14/86, pp. 100–102; Benjamin Zuckerman, 4/15/86, pp. 9–201 to 9–208.

47. On July 7, 1980, at 3:30 a.m. John Cassidy, who subsequently claimed that his car had been driven off the road by an unknown vehicle, drove his car off the road and into a pole. *See* D'Imperio, 4/10/87, pp. 96–7.

48. The only witness to that accident was "Thomas Cassidy." *Id.* pp. 97–8.

49. Defendant Kathleen Cassidy gave a sworn deposition in which she testified that Thomas Cassidy was not Joseph Houghton. Bejamin Zuckerman, 4/15/86, pp. 9–201 to 9–204.

50. Defendant John Cassidy gave a sworn deposition in which he described a "Thomas Cassidy" that was not Joseph Houghton. Benjamin Zuckerman, 4/15/86, pp. 9–186 to 9–194.

51. "Thomas Cassidy" is defendant Joseph Houghton. John Brook, 4/14/86, pp.

| 890768 | 9/11/78 | $ 36.00 | 3–DD |
| 894466 | 10/02/78 | $ 935.00 | 3–EE |
| 843715 | 10/03/78 | $ 1,695.00 | 3–FF |
| 902904 | 10/31/78 | $ 620.73 | 3–GG |
| 976501 | 08/08/79 | $ 1,250.00 | 3–HH |
| 97502 | 08/08/79 | $15,000.00 | 3–II |
| 163092 | 07/10/80 | $ 120.00 | 3–JJ |
| | | $25,330.75 | |

I note that Keystone's own documents indicate that the payments made via the last three drafts (Government Exhibits 3–HH to 3–JJ) concern a different accident (which occurred on June 29, 1979); however, since the claim num-

ber (07–327890) and the policy number (0920–2791) are the same for all the drafts, I will assume that all the drafts relate to the November, 1977, accident. Also, I note for the record that defense counsel did not raise an objection with respect to the last three drafts. Notes of Testimony (N.T.), 11/16/87, p. 47, lines 2–3.

**8.** Q. [Mr. Carroll] How was this estimate done then seven or eight years later?
A. [D'Imperio] It was just an estimate.
N.T., 11/16/87, pp. 72–3.

142–43; Gus Lesnevich, 4/18/86, pp. 12–205 to 12–206; James Price, 4/21/86, 13–42 to 13–46; John W. Cawley, 4/21/86, 13–73.

52. Joseph Houghton, John Cassidy, and Kathleen Cassidy devised a scheme to defraud Keystone.

### G. *Mailings Relevant to the 1980 Accident.*

53. On August 7, 1980, James "Skip" Oliver, Esquire, on behalf of John Cassidy, notified Keystone of the accident and Cassidy's uninsured motorist claim. Government Exhibit 18–E.

54. The identification number assigned to the Cassidy claim was 07–384362.

55. On May 21, 1981, in connection with his claim against Keystone, John Cassidy made a sworn statement describing the July 7, 1980, accident. Government Exhibit G; Plaintiff's Exhibit C. This affidavit contained material misrepresentations. This affidavit was enclosed in a letter sent by Bernard DiGiacomo, Esquire, to Keystone.

56. I find by a preponderance of the evidence that Joseph Houghton, John Cassidy, and Kathleen Cassidy knowingly and willfully caused the May 21, 1981, statement to be placed in the U.S. mails in furtherance of a scheme to defraud Keystone. Such conduct violated 18 U.S.C. §§ 1341, 2.

57. On July 6, 1981, John Cassidy wrote a letter to Keystone requesting resolution of his claim. Government Exhibit 18–H.

58. The indictment in Criminal Action No. 85–349 charged Joseph Houghton a/k/a "Thomas Cassidy", John Cassidy, and Kathleen Cassidy with willfully causing the delivery, via mail, of John Cassidy's July 6, 1981, letter to Keystone for the purposes of executing and aiding a scheme to defraud various insurance companies including Keystone. Plaintiff's Exhibit F, Count 16. The jury convicted the defendants on this count. I note for the record that the July 6, 1981, mailing occurred after Keystone tendered its last payment to Mr. Cassidy. *See* Government Exhibit P, dated March 3, 1981.

### H. *Keystone's Injuries Resulting from the 1980 Accident.*

59. Keystone paid out $14,280.26 [9] in connection with the July 7, 1980, accident. Plaintiff's Exhibit E; D'Imperio, 11/16/87, pp. 47, 52–3 (Claim No. 07–384362).

60. Keystone also seeks to recover $27,-117.34 spent defending lawsuits allegedly spawned by the July, 1980, accident, D'Imperio, 11/16/87, pp. 53–62, $400.00 for investigators, *id.* p. 62, and $10,000.00 for administrative costs, *id.*

61. Based on the record before me, I am constrained to find that Keystone has not demonstrated with sufficient evidence that the $27,000 in legal fees was connected to the legitimacy of the July, 1980, accident. D'Imperio, 11/16/87, pp. 117–20.

62. Turning to the $10,000 claimed as administrative expenses, plaintiff's claim lacks an itemization of the number of hours spent working on the Cassidy claim.[10]

### I. *Did the Houghton Group Constitute an Enterprise?*

[4] 63. Joseph Houghton would either plan the bogus accidents or would initiate the process whereby he and his associates could profit from actual accidents. Tape Transcript No. 8, pp. 4–7, 14–49. Joseph Houghton would also coach individuals on

---

**9.** This total is derived from adding the following drafts:

| Draft No. | Date Issued | Amount | Exhibit |
| --- | --- | --- | --- |
| A223997 | 10/07/80 | $ 100.00 | 18–J |
| A223998 | 10/07/80 | $ 40.00 | 18–K |
| A223999 | 10/07/80 | $ 47.15 | 18–L |
| A224000 | 10/07/80 | $ 320.00 | 18–M |
| 172598 | 10/21/80 | $12,323.85 | 18–N |
| 186444 | 12/09/80 | $ 927.36 | 18–O |
| 205124 | 03/03/81 | $ 522.00 | 18–P |
| | | $14,280.36 | |

**10.** (*Id.* at 120–1)

Q. Is it fair to say that in arriving at the $10,000 you used your guess or approximation of how much time you spent on the project and somehow projected that into how much time others might have spent on the project also?

A. That's correct.

N.T., 11/16/87, at p. 120.

how to obtain benefits. *See* Recorded Conversation, July 20, 1983, Tape Transcript No. 6, pp. 3–6. Following a bogus accident or a minor accident, some or all of the defendants would ban together to form a "support group" to strengthen the chances of obtaining money from insurance companies, including Keystone. Christine Johannes–Fredrich, 4/2/86, pp. 18–9 (ploy to antagonize truck drivers and provoke an accident or fight), pp. 19–20, 99–101 (request to fly to Florida in summer of 1980 to witness a fake accident on a desolate road); J. Albeser, 4/7/86, pp. 48–72. The support group would provide corroborating accounts of the accident to police, health care providers, and insurance companies. The support group would also insure that the police accident report or hospital report would reflect the group's version of the event. Also, the group would convey the reports to the appropriate lawyer or insurance companies. *See generally* Recorded Conversation, July 13, 1983, Tape Transcript No. 6 (Joseph Houghton explaining need to obtain accident report); Steven Weinstein, 4/9/86, pp. 37–64 (testifying about Frank Livoy's role as witness "Norman Bradley"); Charles Menszak, 4/9/86, pp. 182–6 (testimony about Donna Livoy Houghton's deposition in which she described collection of witness statements); Findings of Fact 22, 25, 32, 55.

64. As a result of the defendants' actions, described throughout the Findings of Fact, the enterprise and the defendants benefitted financially.

65. Besides the predicate acts at issue in the present case, the Houghton Group coordinated the commission of several other illegal acts and frauds schemes against various other insurance companies. *See* Testimony of Benjamin Zuckerman; Karen Nephin; Finding of Fact 67; Indictment and Judgment & Commitment Orders in Criminal Action No. 85–349.

66. The activities of the Houghton Group affected interstate commerce.

### J. *Pattern of Racketeering Activity.*

67. The Houghton Group committed a significant number of unlawful acts

against a number of insurance companies. *See* Findings of Fact 34, 56, 58; Indictment and Judgment & Commitment Orders which summarize the convictions in Criminal Action 85–349 including convictions on: Count One (J.C. Penney Life Insurance to September 30, 1980); Count Two (Academy Life Insurance Co., October 31, 1980); Count Five (letter to Cillenszak, December 8, 1980); Count Eleven (Allstate Insurance Co., October 22, 1981); Count Nineteen (CNA Insurance Co., November 23, 1981); Plaintiff's Exhibits G, H, I, J, K, L.

68. These acts were committed from at least late 1978 to late 1981.

69. The acts were similar to the extent that each involved the use of the United States mails to further various schemes to defraud different insurance companies. Nonetheless, the mailings concerned a number of different bogus accidents each having a unique factual scenerio.

70. While the identity and number of individuals who perpetrated the illegal acts was not static, the defendants all engaged in a substantial number of the acts.

71. The activities of the Houghton Group against the various insurance companies certainly did not constitute sporadic activity; rather, the Houghton Group coordinated a continuous course of conduct against the insurance companies. Moreover, the acts were related to one another in the sense that the Houghton Group sought to maximize its profits from each bogus accident and, therefore, submitted as many claims as possible for each accident.

### K. *Defendants' Statute of Limitations Defense Concerning the RICO Claim.*

72. Keystone conducted an investigation of the 1980 accident. D'Imperio, 11/16/87, at 78.

73. Mr. D'Imperio, then a Keystone claim examiner, became involved with the claim for the July, 1980, accident in late 1980. *Id.* at 82.

74. In 1981, after Keystone had made some payments in connection to the July 7, 1980, accident, Keystone considered

whether to report the claim to the Insurance Crime Prevention Institute (ICPI). D'Imperio, 11/16/87, pp. 31, 83. Claims are referred to the ICPI when the insurance carrier suspects the claim involves fraud. *Id.* Mr. D'Imperio referred the claim to the ICPI in 1981. *Id.* at 83.

75. Following the submission of the claim for the July, 1980, accident and some initial payments, totaling approximately $14,000, Keystone refused to pay additional benefits. *Id.* at 32, 81. Keystone refused to tender additional payments for medical benefits because it felt the claim had the "classic symptoms of ... being a fraudulent case." *Id.* at 33. For the same reason Keystone also disputed Mr. Cassidy's claim and lawsuit setting forth an uninsured motorist claim. *Id.* at 35. After March 3, 1981, Keystone ceased all payments. *Id.* at 32–3; Government Exhibit 18–P.

76. In late 1980 or 1981 Keystone discovered that John Cassidy had made similar claims against other insurance companies. *Id.* at 82–3.

77. Thus, Keystone knew by late 1980 or, at the latest, by the middle of 1981 that the claim for the July, 1980, accident involved fraud.

78. During the pendency of Donna Livoy–Houghton's claim predicated on the 1977 accident, Keystone disputed the causal relationship between the accident and the alleged injuries. At the same time, Keystone believed that Donna Livoy–Houghton's wage claim lacked the proper substantiation. D'Imperio, 11/16/87, pp. 29–30, 64, 68, 70–2, 128–130.

79. Despite the fact that it agreed to settle Donna Livoy–Houghton's lawsuit in August, 1979, Keystone—by that time—had substantial doubts about the legitimacy of the 1977 claim. *Id.*

L. *Facts Concerning Plaintiff's Fraud Claim.*

80. Defendants made material misrepresentations and omissions in the various claims, mailings, and communications to plaintiff. Defendants also made material misrepresentations and omissions in depositions related to the accidents.

81. Defendants were not entitled to compensation under the relevant policies because they were not injured in the various accidents.

82. Defendants intentionally made such misrepresentations and omissions.

83. Defendants intended that the plaintiff would rely on these misrepresentations and omissions.

84. Plaintiff justifiably relied on some of these misrepresentations and omissions.

85. Plaintiff was injured by such justifiable reliance on the misrepresentations and omissions in that plaintiff paid monies to the defendants which the defendants were not entitled to.

86. Plaintiff knew or should have known of the fraud in connection to the 1980 accident by the middle of 1981.

87. After a close examination of Mr. D'Imperio's testimony concerning Donna Livoy–Houghton's claim, D'Imperio, 11/16/87, pp. 28–30, 64, 68, 70–2, 128–30, I find that Keystone knew or should have known of the fraud related to the November, 1977, accident by August 30, 1979.

III. CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by virtue of 18 U.S.C. § 1964 and 28 U.S.C. § 1331 and the principle of pendent jurisdiction.

2. Venue is appropriate in this district. 18 U.S.C. § 1965.

A. *Plaintiff's RICO Claim.*

3. Defendants committed various acts of mail fraud as proscribed by 18 U.S.C. §§ 1341, 2. *See* Findings of Fact 32–4, 56–7.

4. Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961. *U.S. v. DiGilio,* 667 F.Supp. 191.

5. Defendant various acts of mail fraud constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961. *Town of Kearny,* 829 F.2d 1263; *Marshall–Silver,* 835 F.2d 63.

6. Defendants' acts of mail fraud described in Findings of Fact 32–4, 56 injured the plaintiff.

7. Plaintiff's civil RICO claim against the defendants is barred by the statute of limitations. Plaintiff knew or should have known of the last injury caused by defendants' predicate acts by mid–1981. This action was filed more than four years after that date.

### B. *Common Law Fraud Claim.*

8. In regards to the July 8, 1980, accident and the subsequent claims, plaintiff has proven that defendants Joseph Houghton, John Cassidy, and Kathleen Cassidy committed fraud in connection with the attempt to prosecute false insurance claims against Keystone.

9. Plaintiff knew or should have known that the 1980 claim was fraudulent by mid–1981.

10. The statute of limitations does not bar plaintiff's claim concerning the bogus 1980 accident since plaintiff filed the lawsuit on July 22, 1986, less than six years after Keystone started making payments to John Cassidy. *A.J. Cunningham,* 792 F.2d 330.

11. In regards to the November 19, 1977, accident, plaintiff has proven that defendants Joseph Houghton and Donna Livoy–Houghton committed fraud.

12. Plaintiff should have known that the 1977 claim was fraudulent by August 30, 1979.

13. The statute of limitations bars plaintiff's claim with respect to the 1977 accident since plaintiff's complaint was filed more than six years following the accrual of the claim.

14. Accordingly, judgment shall be entered in favor of the defendants on Count One and judgment shall be entered in favor of the plaintiff and against defendants Joseph Houghton, John Cassidy, and Kath-

leen Cassidy on Count Two in the amount of $14,680.36 [11] plus interest.

---

**11.** This total is derived from adding the money paid to John Cassidy, *see* note 9, *supra,* and the $400.00 spent for investigators.