**RESOLUTION TRUST CORPORATION, as Receiver of Trustbank Federal Savings Bank, Plaintiff,**

v.

**William L. WALDE, et al., Defendants.**

Civ. A. No. 94–0070–A.

United States District Court, E.D. Virginia, Alexandria Division.

May 4, 1994.

282

James Robert Easthom, Pillsbury, Madison & Sutro, Washington, DC, for Resolution Trust Corp.

Thomas M. Buchanan, Winston & Strawn, Washington, DC, for William L. Walde.

Leslie M. Alden, Verner, Liipfert, Bernhard, McPherson and Hand, McLean, VA, for David A. Neal.

Craig Crandall Reilly, Murphy, McGettigan, Richards & West, P.C., Gregory Lynn Murphy, Murphy, McGettigan, Richards & West, P.C., Alexandria, VA, for Harold G. Bowen.

J. Jonathan Schraub, Robins Kaplan Miller & Ciresi, Washington, DC, for Zalmon D.

Chelec, David L. Erickson, William M. Huey, Thomas O'Dea, and Walter M. Rock.

William M. Huey, pro se.

Harvey B. Cohen, Cohen, Gettings & Dunham, Arlington, VA, for D. Gay Walde.

## MEMORANDUM OPINION

HILTON, District Judge.

The RTC brings this action as receiver of Trustbank Federal Savings Bank ("Trustbank") against the former directors of Trustbank and its predecessor entity Dominion Federal Savings & Loan ("Dominion"). The RTC seeks to recover $20 million from the defendants for breach of fiduciary duty, negligence, gross negligence and violations of federal statutes and regulations.

Each count is based on the defendants' alleged failure to observe careful lending practices and to comply with thrift regulations in the course of a series of credit transactions with certain related entities collectively called "EPIC."

The last loan transaction was made with EPIC on August 26, 1985. On September 5, 1985, EPIC filed for protection under Chapter 11 of the Bankruptcy Code and allegedly defaulted on over $88 million in principal and interest owed to Dominion. The $20 million sought by the RTC allegedly represents the uncollected amount remaining of the $88 million in defaulted EPIC loans.

Less than two months after the EPIC collapse and continuing through to Trustbank's receivership, Dominion and Trustbank disclosed the fact and extent of the EPIC losses. In a Form 8–K dated October 16, 1985, Dominion reported that EPIC had defaulted on "$65 million of single-family residential mortgages held by Dominion;" EPIC's parent Community Savings and Loan Association had defaulted on $10 million in loans; and various EPIC partnerships had defaulted on an additional $7 million in loans. The 8–K also reported that Dominion had allocated $5 million of its loan loss reserves to cover potential EPIC losses.

In the 1986 Annual Report, Dominion's directors disclosed that the EPIC partnerships had defaulted on approximately $1.4 billion of mortgage loans. The 1986 Annual Report also disclosed that the $65 million of EPIC loans had become classified as "substandard" assets. Dominion repeated these loss reports in its March 31, 1986 Form 10–K.

The EPIC loss was again reported in Dominion's 1987 Annual Report. It was highlighted both in Walde's message to the shareholders, and in Management's Discussion And Analysis of Financial Results. Dominion's March 31, 1987 Form 10–K also disclosed the losses, scheduled assets and potential losses related to EPIC.

The Annual Reports and Form 10–Ks for 1988, 1989 and 1990 similarly reported the increasing EPIC losses.

In its 1989 Annual Report, Dominion disclosed millions of dollars in further losses "related primarily to loans purchased from EPIC."

In addition to the disclosures made in Dominion's annual filings, Dominion's holdings of $65 million in defaulted EPIC mortgages and its $6 million set aside to cover potential EPIC losses was reported in the *Washington Post* as early as October 9, 1986. The October 1986 Post article also reported that defendant "Neal and Dominion [were] under investigation by federal thrift regulators over ties between Dominion, Ticor Mortgage Insurance Co., and EPIC."

Dominion's directors also publicly disclosed the fact that Dominion was the subject of a Supervisory Agreement with federal regulators in 1984 and the subject of an Operating Agreement with federal thrift regulators in 1988. The 1988 Operating Agreement was disclosed in the 1989 Annual Report.

The FHLBB conducted examinations into Dominion's lending practices in 1982, 1984 and 1986. During each examination, the federal regulators reviewed each and every loan to EPIC. In addition, the regulators had complete access to Dominion's books and files, and they likewise had complete access to all the bank's directors, officers and employees to discuss any regulatory matter they desired.

During the 1986 examination, Dominion provided the FHLBB with a report prepared

by its outside counsel, William Stauffer, which concluded that the EPIC loans constituted a "probable violation" of the loans to one borrower regulation. Mr. Stauffer prepared the report in response to a request made by Mr. Walde on the day of the EPIC collapse.

Pursuant to FHLBB regulations, Dominion was required to and did submit all its securities filings and proxy materials, including its annual reports, 10–Ks and shareholder reports, to the FHLBB. Any action or occurrence that the regulators deem material, including material regulatory violations, are mandated for disclosure. Moreover, the sections of the FHLBB responsible for reviewing securities filings have access to everything in the agency's files, including exam reports and correspondence.

Only after the FHLBB approved the proxy statements and securities filings did Dominion disseminate them to the public. At no time did the FHLBB indicate that there were any problems regarding Dominion's disclosure of the EPIC loans in any securities filings or proxy materials.

Dominion did not renew its D & O policy after its expiration in 1986 based on the fact that coverage was so restricted and the premium and deductibles were so high. The new policy offered to Dominion to replace the policy that expired March 22, 1986, included a reduction in total coverage from $2 million per each officer and director per policy year to an aggregate of $2 million per year to be shared by all officers and directors; an increase in the deductible from $5,000 to $250,-000; an increase in the premium from $5,190 to $220,077 a year; an exclusion for any claims that could be brought by any state or federal agency, including any type of legal action which such agencies had the legal right to bring as receiver, conservator, liquidator, or otherwise, notwithstanding whether such action was brought in the name of such agency or on behalf of such agency by another entity or solely in the name of any third party; an exclusion for any loans which had been charged off as a loss, were delinquent for over 60 days, or defined as a scheduled item; and an exclusion for any acquisition, development and/or construction loans.

Dominion's counsel, William L. Stauffer, prepared a letter which would have advised Dominion's D & O carrier of a possible EPIC related claim. However, Mr. Stauffer advised Dominion's directors that "it was either unnecessary to file or should not be filed." In reliance upon Mr. Stauffer's advice the letter was not sent.

Section 2(b) of Dominion's D & O policy permitted Dominion to purchase tail coverage only "[i]f the insurer shall cancel or refuse to renew this policy." Thus, Dominion had no right to purchase tail coverage in the event Dominion opted not to renew the policy. CNA's "Notice of Cancellation, Non-Renewal, or Reduction in Coverage" dated February 5, 1986, clearly indicates that Dominion, not the insurer, opted not to renew the policy. The Notice states that Dominion's insurance "will not be renewed or continued in force at its expiration for the following reasons: Renewal application not received 50 days prior to its expiration date of 3–22–86." A subsequent Notice to Dominion from its D & O carrier similarly states: "Our records indicate the customer desires to cancel coverage."

Each of Dominion's securities filings and proxy statements was reviewed by George Murphy, a banking/securities attorney with the law firm of Muldoon, Murphy, Faucette and Gray. In connection with these reviews, Dominion disclosed all relevant information to Mr. Murphy, and made available to him any and all documents he requested so that he could adequately review the securities filings and proxy materials. Mr. Murphy also attended a number of Dominion Board of Directors meetings each year and the annual meeting of stockholders. He received and reviewed the regulators' examination reports of the institution and was aware of criticism contained in the 1982 and 1984 examinations that the institution had inadequate underwriting, and the FHLBB's finding in the 1986 examination report that the institution violated the LTOB regulation with respect to the EPIC loans.

After reviewing these materials, Mr. Murphy advised Dominion's directors what information was required to be disclosed. Mr.

Murphy advised Dominion's directors that criticisms of Dominion's loan underwriting procedures contained in the 1982 Examination Report did not need to be disclosed in Dominion's securities filings, because they were not material for securities law purposes. Mr. Murphy similarly advised Dominion's directors that certain criticisms contained in the 1984 and 1986 Examination Reports were not material and should not be included in securities filings. These were criticisms of Dominion's (1) loan underwriting procedures; (2) violations of the loan to one borrower regulation; and (3) non-compliance with the 1984 Supervisory Agreement. Dominion's directors reasonably relied on Mr. Murphy's judgment as to what was appropriate to be put in the securities filings and believed that his approval of the documents was the best judgment the institution could receive as to its obligations under all applicable securities laws.

As the party moving for summary judgment, a defendant has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law, *see* Fed.R.Civ.P. 56(c); *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984), and he may satisfy this burden by the use of "affidavits, exhibits, depositions and other discovery materials." *Barwick*, 736 F.2d at 958–59, *quoting Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968). In response, the RTC, as the non-moving party, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), *quoting* Fed.R.Civ.P. 56(e).

■ The RTC may not pursue claims that became time barred under applicable law prior to its appointment as receiver. *See e.g., FDIC v. Cocke*, 7 F.3d 396, 400 (4th Cir.1993). Each of the RTC's claims is governed by Virginia's one year statute of limitations applicable to claims for personal injury other than bodily injury. Va.Code § 8.01–248; *Cocke*, 7 F.3d at 401–02 (holding that claims identical to those asserted here are governed by one year limitations period). *See also LaVay Corp. v. Dominion Federal Savings & Loan Ass'n*, 830 F.2d 522, 527 (4th Cir.1987) (holding one year limitations period of Va.Code § 8.01–248 applies to claims against bank directors for breach of fiduciary duty, negligence and gross negligence), *cert. denied* 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *C–T of Virginia, Inc. v. Barrett*, 124 B.R. 689, 693 (W.D.Va.1990) (holding breach of fiduciary duty of corporate officer is tort subject to Va.Code § 8.01–248 one year statute of limitations); *RTC v. Everhart*, 837 F.Supp. 155, 158 (E.D.Va.1993) (holding one year limitations period of Va.Code § 8.01–248 applicable to breach of fiduciary duty, negligence and gross negligence claims against bank directors).

■ The Virginia accrual rule applicable to the RTC's claims states:

In every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitations period shall begin to run from the date the injury is sustained in the case of injury to the person ...

Va.Code § 8.01–230. Moreover, the initial degree of damage is immaterial. "If any injury or damage immediately results from the wrongful or negligent act of another, the party aggrieved has a cause of action, and the statute of limitations begins to run at that time." *Stone v. Ethan Allen, Inc.*, 232 Va. 365, 369, 350 S.E.2d 629, 632 (1986). *See also International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 128 (4th Cir.1988) ("In Virginia, only the slightest injury is required to start the running of the limitations period.... It is of no consequence that the amount of damages [is] not ascertainable until a later date.").

The RTC alleges that EPIC defaulted on its loans with Dominion in September 1985. September 1985 is thus the latest date that the RTC's actions could have accrued. Applying Virginia's one year limitations period, and adding six months as required by Va.

Code § 6.1–110.11 [1] each of the RTC's claims expired in March 1986, almost four years before the RTC was appointed receiver.

■ Recognizing that its claims are otherwise time barred, the RTC seeks to equitably toll the statute of limitations by alleging that Trustbank's directors intentionally misrepresented and concealed their wrongful acts and omissions. The RTC also includes an allegation in the complaint suggesting it may invoke the doctrine of adverse domination. However, the tolling theory is not recognized in Virginia, and controlling Fourth Circuit precedent precludes its application to this case. See Cocke, 7 F.3d at 402.

However, as a matter of law, the RTC cannot satisfy the elements necessary to toll Virginia's statute of limitations.

■ In Virginia "a statute of limitations is tolled until a person intentionally misled by a putative defendant could reasonably discover the wrongdoing and bring action to redress it." Cocke, 7 F.3d at 402. Moreover, constructive fraud is not sufficient to toll the running of a statute of limitations. Rather, as the Fourth Circuit recently explained:

> The character of fraud necessary to toll the statute must be of a variety involving moral turpitude. A defendant must intend to conceal the discovery of the cause of action by trick or artifice and must have thus actually concealed it from the plaintiff in order for the exception to apply.

Id. (quoting Richmond Redev. & Hous. Auth. v. Laburnum Constr. Corp., 195 Va. 827, 840, 80 S.E.2d 574, 582 (1954). Under Virginia law, the party seeking to prove fraud has the burden of proving the element of intent, or scienter, by clear and convincing evidence. Mills v. Miller Harness Co., 229 Va. 155, 157, 326 S.E.2d 665, 666 (1985). The RTC, however, has offered no evidence that any of the defendants intended to fraudulently conceal any wrongdoing. Nor can the RTC meet its burden of proving that Dominion's shareholders could not reasonably have discovered the EPIC related causes of action.

To support its claims of fraudulent concealment, the RTC alleges that prior to November 5, 1986, defendants (1) let their D & O policy lapse, failed to notify their D & O insurance carrier of potential EPIC related claims, and failed to purchase "tail coverage;" (2) understated EPIC losses in securities filings; (3) failed to include in securities filings and proxy statements an admission that the FHLBB had criticized Dominion's underwriting procedures and that the institution violated the LTOB regulation; and (4) failed to disclose that they had violated the November 1984 Supervisory Agreement by reason of the EPIC loans. When examined in light of the undisputed facts, none of these allegations even supports a finding of intent to conceal, let alone establishes intent to conceal by clear and convincing evidence.

The RTC produced no evidence that Dominion's decisions not to renew its D & O policy, not to notify its carrier of potential EPIC related claims, and not to purchase tail coverage were motivated by a desire to conceal the EPIC related claims from shareholders. Moreover, the RTC cannot even demonstrate a logical connection between these decisions and the defendants alleged desire to avoid disclosure. Neither renewal of Dominion's D & O policy, the filing of a claim notice, nor the purchasing of tail coverage would have revealed anything to Dominion's shareholders about the EPIC loans.

In addition, the undisputed evidence shows Dominion made the decisions for compelling business reasons wholly unrelated to EPIC. As a letter from Dominion's D & O insurance broker indicates, Dominion did not renew its D & O policy "based on the fact that coverage was so restricted and the premium and deductibles so high."

Dominion failed to notify its D & O carrier of potential EPIC related claims because its legal counsel, William L. Stauffer, advised it not to do so. Although the RTC alleges

1. Va.Code § 6.1–110.11 provides that "[n]otwithstanding any other law of the Commonwealth, the statute of limitations shall be extended for a period of six months on all causes of action which may accrue to the FDIC as receiver." The section is applicable to the RTC by virtue of Va.Code § 6.1–110.1, which defines "FDIC" as "any successor to" FDIC "which undertakes to discharge the purposes of the FDIC."

Dominion's counsel did recommend the carrier be notified, it has offered no evidence to rebut Mr. Stauffer's testimony or Mr. Walde's affidavit.

The RTC's allegation that defendants "failed to extend coverage (frequently known as "tail" coverage) for a one year period, which they had the option of extending at a reasonable price, ignores the facts. Section 2(b) of Dominion's D & O policy permitted Dominion to purchase tail coverage only "[i]f the insurer shall cancel or refuse to renew this policy." (letter from D & O carrier stating: "You will have a right to an extension of coverage under Clause 2(b) of the policy, as amended, only in the event that such amended policy is non-renewed or canceled by us."). Thus, Dominion had no right to purchase tail coverage in the event Dominion opted not to renew the policy. CNA's "Notice of Cancellation, Non–Renewal, or Reduction in Coverage" dated February 5, 1986, clearly indicates that Dominion, not the insurer, opted not to renew the policy. The Notice states that Dominion's insurance "will not be renewed or continued in force at its expiration for the following reason: Renewal application not received 50 days prior to its expiration date of 3–22–86." A subsequent Notice to Dominion from its D & O carrier similarly states: "Our records indicate the customer desires to cancel coverage."

The RTC has offered no evidence to support its allegation that Dominion understated EPIC losses in securities filings before November 5, 1986. Dominion's directors were obligated under FHLBB directives not to treat as delinquent, and not to set aside cash reserves to cover, those EPIC loans that were insured by mortgage insurers who participated in the EPIC bankruptcy plan. Nearly one-half of all EPIC loans were covered by these directives. Dominion estimated that after accounting for mortgage insurance and the sale of collateral, EPIC's losses on the remaining loans would be $6 million.

All of these facts were disclosed in Dominion's 1986 Annual Report, including that Dominion held $65 million in defaulted EPIC loans and that it had set aside $6 million to cover anticipated losses. Further, the FHLBB agreed with Dominion's potential loss estimates. The FHLBB's 1986 Examination Report stated with respect to EPIC that "[t]he examiner's analysis indicates that the $6,000,000 loss reserve is sufficient to cover potential losses at this time."

The RTC has offered no evidence suggesting that in 1986, $6 million was not a reasonable approximation of Dominion's loss on those EPIC loans that were not insured by mortgage insurers who participated in the EPIC bankruptcy plan, after accounting for mortgage insurance and collateral. There is thus no basis to infer that Dominion's disclosure of a $6 million loss from the EPIC loans evidenced an effort by its directors to conceal the EPIC related causes of action from shareholders.

Nor can Dominion's failure to disclose the alleged LTOB violations in the Association's securities filings constitute evidence of an intent to conceal EPIC-related causes of action. Even assuming that Dominion ever violated the LTOB regulation, it was under no obligation to disclose the violation in its securities filings.

Dominion was obligated to disclose only those matters with respect to which "there is a *substantial likelihood* that a reasonable shareholder would consider it important" in making investment decisions. *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Dominion's 1986 Annual Report disclosed the amount of defaulted EPIC loans held by Dominion and its allocation of $6 million of loan reserves to cover any resulting losses. Thus Dominion disclosed the actual and potential adverse economic consequences upon Dominion of EPIC's bankruptcy, as reasonably viewed at that time. It cannot be said that an express statement that the institution may have violated the LTOB limitations would have "significantly altered the total mix of" available information. The violations had already ceased to exist, and they were not of the type involving fraud, intentional misconduct or a conflict of interest that may have repercussions in the future.

At the time the 1986 Annual Report was filed, and thereafter, the FHLBB concurred with Dominion's conclusion that its disclosure

regarding the EPIC loans were adequate. Pursuant to FHLBB regulations, Dominion was required to and did submit all its securities filings and proxy materials, including its annual reports, to the FHLBB. Moreover, these filings were the subject of extensive review by FHLBB securities lawyers and accountants with access to all the agency's files, including the 1982, 1984 and 1986 examination reports. Any action or occurrence that the regulators deemed material, including material regulatory violations, would have been mandated for disclosure. At no time did the FHLBB ever indicate that there were problems with the disclosure of the EPIC loans contained in any securities filings or proxy materials. Omissions which were not even deemed material by the FHLBB at the time the securities filings were prepared cannot now evidence intentional concealment rising to the level of "moral turpitude."

The extent of Dominion's disclosures in securities filings cannot evidence an intent to conceal EPIC-related causes of action for the additional reason that Dominion relied on an experienced banking/securities attorney, George Murphy, in the preparation of the bank's securities filings. In connection therewith, Dominion disclosed all relevant information to Mr. Murphy, and made available to him any and all documents he requested so that he could adequately review the securities filings and proxy materials. Mr. Murphy advised Dominion's directors that the bank should not include in its securities filings certain criticisms contained in the FHLBB's 1982, 1984, and 1986 Examination Reports because they were not "material." These were criticisms of Dominion's (1) loan underwriting procedures; (2) violations of the loans to one borrower regulation; and (3) non-compliance with the 1984 Supervisory Agreement—precisely the omissions the RTC attributes to the defendants alleged desire to conceal EPIC related causes of action.

Dominion's directors reasonably relied on Mr. Murphy's judgment as to what was appropriate to be put in the securities filings and believed that his approval of the documents was the best judgment the institution could receive as to its obligations under all applicable securities laws. This reliance on counsel is incompatible with the RTC's allegation that the information was omitted to conceal potential claims from stockholders.

During examinations conducted by the FHLBB in 1982, 1984 and 1986, the federal regulators reviewed each and every loan to EPIC, and were given complete access to Dominion's books and files. They also had complete access to Dominion's directors, officers and employees to discuss any regulatory matters they desired. In addition, during the 1986 examination, Dominion provided the FHLBB with a report prepared by its outside counsel, William Stauffer, which concluded that the EPIC loans constituted a "probable violation" of the loans to one borrower regulation. Mr. Stauffer prepared the report in response to a request made by Mr. Walde on the day of the EPIC collapse. Mr. Walde expressly instructed Mr. Stauffer that "he didn't want a whitewash." Mr. Stauffer, who was personally involved in every interview, testified that he was provided with everything he requested and "there was no one who didn't cooperate."

Dominion's directors' retention of Mr. Stauffer to conduct a thorough and honest investigation of the EPIC loans and the bank's complete and full disclosure of all material facts to the regulators, despite the FHLBB's power to close the bank if wrongdoing were discovered, is wholly inconsistent with an intent to conceal the fact or cause of the EPIC losses. Indeed, it would make little sense to embark on a conspiracy of silence, as the government alleges, while at the same time making extraordinary efforts to uncover regulatory violations and disclosing everything to the regulators, who no doubt possessed much more power to take action against the defendants than the shareholders.

In order to equitable toll the statute of limitations, the RTC must also prove that discovery of the EPIC-related causes of action was "actually concealed" from Dominion's shareholders. *Cocke*, 7 F.3d at 402. The RTC has not even alleged facts establishing actual concealment, let alone offered evidence of actual concealment. While the

undisputed evidence shows that the directors made adequate disclosure, the undisputed facts also demonstrate that publicly available information was more than adequate to alert Dominion shareholders of any EPIC related claims.

The EPIC failure received considerable media coverage. Numerous articles were written in major and local newspapers on Dominion's or Trustbank's relationship with EPIC. Through the extensive media coverage, shareholder meetings, and word of mouth, it can be presumed that most if not all shareholders were on notice of the material facts regarding the EPIC loans.

 Equitable tolling only applies in Virginia where the defendant has actually concealed his culpability and the fact of the injury. A plaintiff aware of his injury is on "inquiry notice" to discover his cause of action by use of "ordinary diligence." *STB Mktg. Corp. v. Zolfaghari*, 240 Va. 140, 144–145, 393 S.E.2d 394, 397 (1990); *Page v. Shenandoah Life Ins. Co.*, 185 Va. 919, 928, 40 S.E.2d 922, 926–27 (1947); *Cocke*, 7 F.3d at 402 (limitations only tolled until plaintiff could "reasonably discover the wrongdoing"). Thus, even a defendant who fails to acknowledge his culpability in response to direct inquiries from the plaintiff concerning the cause of the plaintiff's loss will not be equitably estopped from asserting the statute of limitations. *Pocahontas Supreme Coal Co., v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–219 (4th Cir.1987). Here, Dominion's shareholders were aware at the very least that they had suffered a loss attributable to the EPIC loans; EPIC, Dominion and Defendant Neal were under investigation by federal thrift regulators in connection with the EPIC loans; and EPIC's underwriting practices prior to 1984, and thus those in place at the time many EPIC loans were unwritten, gave rise to an FHLBB Supervisory Agreement "prescrib[ing] policies and procedures relating to loan and investment underwriting." Such information would have put a reasonably diligent person on notice that he may have a cause of action to recover his losses.

 Similarly, the RTC's allegation that Dominion understated the EPIC losses, even if true, cannot constitute evidence of actual concealment. Dominion's disclosure of any loss attributable to the EPIC loans is sufficient to preclude equitable tolling. As discussed *supra*, "[i]n Virginia, only the slightest injury is required to start the running of limitations period.... It is of no consequence that the amount of damages [is] not ascertainable until a later date." *International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 128 (4th Cir. 1988). Thus, that the plaintiff is not aware of the full extent of the loss is not material.

Since the undisputed evidence shows disclosure on the part of these defendants and demonstrates no intentional misrepresentation or concealment of wrongful acts and omissions, the defendants are entitled to summary judgment, as this action was not timely filed. Individual defendants have raised defenses to the allegations in the complaint. Addressing those defenses would serve no useful purpose as the complaint was not timely filed.